# United States Court of Appeals

*for the*

# Third Circuit

Case Nos. 22-2289 and 22-2377

WINN-DIXIE STORES, INC.; BI-LO HOLDINGS, LLC,

*Appellants,*

– v. –

EASTERN MUSHROOM MARKETING COOPERATIVE, INC.; ROBERT A. FERANTO, JR., t/A Bella Mushroom Farms; BROWNSTONE MUSHROOM FARMS, INC.; TO-JO FRESH MUSHROOMS, INC.; CARDILE MUSHROOMS, INC.; CARDILE BROS. MUSHROOMS PACKAGING; COUNTRY FRESH MUSHROOM CO.; FOREST MUSHROOM, INC.; FRANKLIN FARMS, INC.; GINO GASPARI & SONS, INC.; GASPARI BROS. INC.; GIORGI MUSHROOM COMPANY; GIORGIO FOODS, INC.; KAOLIN MUSHROOM FARMS, INC.; SOUTH MILL MUSHROOM SALES, INC.; LRP MUSHROOMS INC.; LRP-M MUSHROOMS LLC; LEONE PIZZINI AND SON, INC.; MODERN MUSHROOMS FARMS, INC.; SHER-ROCKEE MUSHROOM FARM; C & C CARRIAGE MUSHROOM CO.; OAKSHIRE MUSHROOM FARM, INC.; PHILLIPS MUSHROOM FARMS, INC.; HARVEST FRESH FARMS, INC.; LOUIS M. MARSON, JR., INC.; MARIO CUTONE MUSHROOM CO., INC.; M.D. BASCIANI & SONS, INC.; MONTEREY MUSHROOMS, INC.; MASHA & TOTO, INC., t/a M&T Mushrooms; W & P MUSHROOM, INC.; MUSHROOM ALLIANCE, INC.; CREEKSIDE MUSHROOMS LTD; J-M FARMS, INC.; UNITED MUSHROOM FARMS COOPERATIVE, INC.; JOHN PIA; MICHAEL PIA.

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## BRIEF FOR PLAINTIFFS-APPELLANTS AND APPENDIX VOLUME 1 OF 7 (pages A1-A19)

PATRICK J. AHERN
AHERN AND ASSOCIATES, P.C.
*Attorney for Plaintiffs-Appellants*
8 South Michigan Avenue, Suite 3600
Chicago, Illinois 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

No. __22-2289__

Winn-Dixie Stores, Inc., and Bi-Lo Holding LLC

v.

Eastern Mushroom Marketing Cooperative, Inc., et al.

Instructions

      Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

      Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

      The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

      The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

      If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Winn-Dixie Stores, Inc. and Bi-Lo Holding LLC
_____
(Name of Party)

       1) For non-governmental corporate parties please list all parent corporations: Southeastern Grocers, Inc.

       2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

       3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None

       4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not Applicable

_____
(Signature of Counsel or Party)

Dated: July 24, 2022
_____

**rev: 09/2014**　　　　　　　(Page 2 of 2)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................v

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES ........................................................................2

STATEMENT OF RELATED CASES .......................................................6

STATEMENT OF THE CASE......................................................................7

    I.    THE OVERWHELMING EVIDENCE SHOWED THAT
THE EMMC MEMBERS PARTICIPATED IN THE
CONSPIRACY AND THAT IT WAS SUCCESSFUL .......................7

    II.    THE OVERWHELMING AND UNDISPUTED EVIDENCE
SHOWED THAT THE EMMC AND ITS MEMBERS HAD
MARKET POWER, THAT THE EMMC MINIMUM
PRICING AND THE AMC TARGET PRICING HAD AN
IMPACT ON THE MARKET AS A WHOLE AND THAT
PLAINTIFF WAS IMPACTED BY HIGHER PRICES
CAUSED BY THE EMMC MINIMUM PRICES AND
POLICIES AND AMC TARGET PRICES ........................................12

        A.    Impact on the Market As A Whole ...........................................12

        B.    Market Power ...........................................................................14

    III.    RELEVANT PROCEDURAL HISTORY ........................................17

SUMMARY OF ARGUMENT ...............................................................18

STANDARD OF REVIEW ....................................................................19

ARGUMENT .........................................................................................20

    I.    THE DISTRICT COURT SHOULD HAVE GRANTED A
NEW TRIAL BASED ON AN INCONSISTENT VERDICT
AND THAT THE JURY'S VERDICT ON
PARTICIPATION IN THE CONSPIRACY AND
COMPETITIVE HARM WAS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE .......................................................20

A.    Inconsistent Verdict on the Participation of EMMC Members in the Conspiracy to Raise Mushroom Prices...........22

B.    The Jury's Finding that Not a Single Member of the EMMC Participated in the Conspiracy Is Against the Manifest Weight of the Evidence ............................................26

II.    THE DISTRICT COURT SHOULD HAVE GRANTED A NEW TRIAL BASED ON THE JURY'S FAILURE TO FOLLOW ITS INSTRUCTION ON COMPETITIVE HARM AND THE FACT THAT THE JURY'S VERDICT ON COMPETITIVE HARM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE .......................................................28

III.    DEFENDANTS FAILED TO CARRY THEIR BURDEN ON PROCOMPETITIVE BENEFITS .......................................................35

IV.    THE JURY'S FAILURE TO FOLLOW CERTAIN JURY INSTRUCTIONS WARRANTS A NEW TRIAL...............................38

V.    THE COURT ERRED IN DENYING PLAINTIFF'S MOTION *IN LIMINE* FOR THE APPLICATION OF THE QUICK LOOK RULE OF REASON ANALYSIS TO THE EMMC MINIMUM PRICES AND PRICING POLICY...................39

VI.    REPEATED REFERENCES TO SAVING FARMS AND DECREASING LOSSES BY THE EMMC DEFENDANTS AND THEIR COUNSEL, IN VIOLATION OF THE DISTRICT COURT'S IN LIMINE ORDER, WARRANTS A NEW TRIAL ...................................................................................43

CONCLUSION .......................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acumen LLC v. Advanced Surgical Serve.,*
   561 F.3d 199 fn. 18 (3d Cir. 2009) ................................................................ 21-22

*Barrett v. Fields*,
   924 F. Supp. 1063 (D. Kan. 1996)........................................................................15

*Brown v. Nutrition Mgmt. Servs. Co.,*
   2010 U.S. App. LEXIS 5535 (3d Cir. 2010) ......................................................33

*Buddy's Plant Plus Corp. v. Centimark Corp.,*
   2014 U.S. Dist. LEXIS 43040 (W.D. Pa 2014), *aff'd* 604 Fed. Appx. 134
   (3d Cir. 2015)........................................................................................................21

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999) ..................................40

*Chicago Prof'l Sports Ltd. P'ship v. NBA*,
   961 F.2d 667 (7th Cir. 1992) ...............................................................................40

*Colonell v. Goodman*,
   78 F. Supp. 845 (E.D. Pa.), *aff'd* 169 F.2d 275 (3d Cir.), *cert. denied*,
   335 U.S. 870, 93 L. Ed. 414, 69 S. Ct. 166 (1948)..............................................38

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.,*
   2015 U.S. Dist. LEXIS 56504 (D.N.J. 2015) ................................................. 29-30

*Deutscher Tennis Bund v. ATP Tour, Inc.,*
   610 F.3d 820 (3d Cir. 2010), *cert. denied*, 562 U.S. 1064,
   131 S. Ct. 658, 178 L. Ed. 2d 482 (S. Ct. 2010)..................................... 35, 40, 42

*Draper v. Airco, Inc.*,
   580 F.2d 91 (3d Cir. 1978) ............................................................................ 47-48

*EEOC v. Delaware Dep't of Health & Social Services,*
   667 F. Supp. 1057 (D. Del. 1987)................................................................... 38, 39

*Elia v. Roberts*,
   2019 U.S. Dist. LEXIS 169311 (E.D. Cal. 2019)................................................38

*Feinberg v. Mathai*,
   60 F.R.D. 69 (E.D. Pa. 1973)...............................................................................39

*Fineman v. Armstrong World Indus.*,
  980 F.2d 171 (3d Cir. 1992) .......................................................... 20, 47

*Food Lion LLC v. Dean Foods Co.*,
  Civ. A. No. 07-188, 2016 U.S. Dist. LEXIS 42180, 2016 WL 1259959 ...... 42, 43

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986) ....................................40

*Gardner v. Vogel*,
  237 F. Supp. 119 (E.D. Pa. 1964) .........................................................38

*Gordon v. Lewistown Hosp.*,
  423 F.3d 184 (3d Cir. 2005), *cert. denied*, 547 U.S. 1092,
  126 S. Ct. 1777, 164 L. Ed. 2d 557 (S. Ct. 2006)................................................29

*Graphics Prods. Distribs. v. Itek Corp.*,
  717 F.2d 1560 (11th Cir. 1983) .................................................... 15, 30

*Greate Bay Hotel & Casino v. Tose*,
  34 F.3d 1227 (3d Cir. 1994) ........................................................ 20, 47

*Greenleaf v. Garlock, Inc.*,
  174 F.3d 352 (3d Cir. 1999) ....................................... 19, 20-21, 25, 26

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ................................................................40

*J.A. Jones Constr. Co. v. Steel Erectors, Inc.*,
  901 F. 2d 943 (11th Cir. 1990) ............................................................38

*King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*,
  791 F.3d 388 (3d Cir. 2015) .................................................................29

*Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co.*,
  734 F.2d 133 (3d Cir. 1984) ................................................................21

*McCormick v. City of Wildwood*,
  439 F. Supp. 769 (D.N.J. 1977) .................................................... 38, 39

*McMillan v. Weeks Marine, Inc.*,
  478 F. Supp. 2d 651 (D. Del. 2007)......................................................22

*National Collegiate Athletic Ass'n v. Board of Regents*,
  468 U.S. 85 (1984)............................................................ 36, 40, 41, 42

*National Society of Engineers v. US.*,
  435 U.S. 679 (1978) ................................................................ 40, 41, 42

*Nissho-Iwai v. Occidental Crude Sales, Inc.*,
  729 F.2d 1530 (5th Cir. 1984) ...................................................... 33, 38

*Pryer v. C.O. 3 Slavic*,
  251 F.3d 448 (3d Cir. 2001) ................................................................21

*Realcomp II Ltd. v. FTC*,
  635 F.3d 815 (6th Cir. 2011) ..............................................................41

*Reazin v. Blue Cross & Blue Shield*,
  899 F.2d 951 (10th Cir. 1990) ............................................................15

*Riley v. K Mart Corp.*,
  547 U.S. 1092, 126 S. Ct. 1777, 164 L. Ed. 2d 557 (3d Cir. 1988) ....................26

*Rose v. Brown Mach. Div.*,
  1995 U.S. Dist. LEXIS 3566 (E.D. Pa. 1995) ......................................38

*Shushereba v. R. B. Industries, Inc.*,
  104 F.R.D. 524 (W.D. Pa. 1985) .................................................... 38, 39

*Straub v. Reading Co.*,
  220 F.2d 177 (3d Cir. 1955) ...............................................................48

*Thomas v. Stalter*,
  20 F.3d 298 (7th Cir. 1994) ...............................................................38

*U.S. v. Brown University*,
  5 F.3d 658 (3d Cir. 1993) ................................................ 29, 35, 40, 41

*Waddington North Am., Inc. v. Sabert*,
  2011 U.S. Dist. LEXIS 86632 (D.N.J. 2011) ................................. 47, 48

*Wilk v. Am. Med. Ass'n*,
  895 F.2d 352 (7th Cir. 1990), *cert. denied*, 496 U.S. 927, 110 S. Ct. 2621,
  110 L. Ed. 2d 642 (S. Ct. 1990) .................................................... 15, 30

*Williamson v. Conrail*,
  926 F.2d 1344 (3d Cir. 1991) ............................................................22

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
  2022 U.S. Dist. LEXIS 65790 (E.D. Pa. 2022) ............................. 20, 42

*ZF Meritor LLC v. Easton Corp.*,
  769 F. Supp. 2d 684 (D.Del. 2011), *aff'd,* 696 F.3d 254 (3d Cir. 2012) ..............22

**Statutes and Other Authorities:**

28 U.S.C. § 1291 ....................................................................................1

28 U.S.C. § 1292(b) ..............................................................................6

28 U.S.C. § 1331 ....................................................................................1

6 A.J. Moore, Moore's Federal Practice, ¶59.08(4) (2d ed. 1983) ................... 38, 39

Fed. R. Civ. P. 23(f) ...............................................................................7

Fed. R. Civ. P. 50 ................................................................................22

Fed. R. Civ. P. 59 ........................................................................ 20, 22, 25

Fed. R. Civ. P. 59(a) ................................................................... *passim*

Fed. R. Civ. P. 59(b) ..........................................................................21

Fed. R. Civ. P. 59(c) ..........................................................................21

Fed. R. Civ. P. 59(d) ..........................................................................21

Wright & Miller, *Federal Practice and Procedure* § 2806 (1995) ........................21

# JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C § 1331. The jury issued it Verdict on March 22, 2022. Dkt. 493 (A2498). On March 23, 2022, the District Court entered a Civil Judgment finding for Plaintiff on three Questions on the Verdict Form and for Defendants on one Question on the Verdict Form. Dkt. 494 (A7).  On April 20, 2022, Plaintiff timely filed a Motion for a New Trial and Judgment Notwithstanding the Verdict. Dkt. 500. (A2787)  On June 13, 2022, the District Court denied Plaintiff's Motion for a New Trial and Judgment Notwithstanding the Verdict and entered an Amended Civil Judgment. Dkt. 503 (A8-A11).  The Amended Civil Judgment and the Denial of Plaintiff's Motion for a New Trial and Judgment Notwithstanding the Verdict are final and appealable Orders that dispose of all of the parties' claims against each other.  On July 13, 2022, Plaintiff timely filed a Notice of Appeal from the District Court's Amended Civil Judgment on June 13, 2022. (A1-A3) This Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1. Whether the jury's verdict finding that there was a single overarching conspiracy to raise the prices of fresh agaricus mushrooms by circulating minimum or target price lists along with the rules and regulations requiring EMMC members to charge those prices was inconsistent with its finding that the EMMC participated in that conspiracy but not a single EMMC member participated in the same conspiracy. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

2. Whether the District Court erred in not granting a new trial based on the jury's inconsistent verdict set forth in Question 1. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

3. Whether the jury's verdict that the EMMC participated in the conspiracy to raise mushroom prices but not a single EMMC member participated in that conspiracy was the result of jury confusion warranting a new trial. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

4. Whether the District Court erred in not granting a new trial based on the jury's inconsistent verdict set forth in Question 3. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

5. Whether the jury's verdict that the EMMC participated in the conspiracy to raise mushroom prices but not a single EMMC member participated in that conspiracy was the result of jury failing to apply the law as instructed warranting a new trial. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

6. Whether the District Court erred in not granting a new trial based on the jury's inconsistent verdict set forth in Question 5. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

7. Whether the overwhelming weight of the evidence established that certain EMMC members described below in the Statement of the Case participated in the conspiracy to raise mushroom prices that the jury found. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial

(A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

8.  Whether the jury's verdict on Question No. 4 on the Verdict Form that the Plaintiff had not proven that conspiracy to raise mushroom prices caused Competitive Harm was against the manifest weight of the evidence. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

9.  Whether the District Court erred in not granting a new trial based on the jury's inconsistent verdict set forth in Question 8 above. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

10. Whether, when it rendered its verdict on Question No. 4 on the Verdict Form that the Plaintiff had not proven that the conspiracy to raise mushroom prices caused Competitive Harm, the jury failed to apply the law as instructed. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

11. Whether the District Court erred in not granting a new trial based on the jury's failure to follow the law as instructed set forth in Question 8 above. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

12. Whether the overwhelming weight of the evidence, much of which was undisputed, established that the EMMC and its members possessed market power and thus established Competitive Harm. Issue raised below by the Jury's Verdict (A2498), the Plaintiff's Motion for a New Trial (A2787), and the District Court's denied of that Motion and entry of the Amended Judgment. (A8-11).

13. Whether the District Court erred in failing to apply the Quick Look Rule of Reason Analysis to the EMMC minimum prices and pricing policies. Issue raised in Dkt. and resolved in the District Court's Order dated February 10, 2022 (A12).

14. Whether the EMMC Defendants and its counsel repeatedly violated the District Court's in limine ruling precluding them from arguing or introducing evidence that the purpose of the EMMC, its minimum prices and pricing policies was to increase producer prices, increase producer profits, decrease

producer losses or help firms stay in operation. Raised during trial with District Court rulings at A301-302, A1013-1014, and A2248-50.

15. Whether the District Court erred in not enforcing its in limine ruling described in Question 14 above. Raised during trial with District Court rulings at A301-302, A1013-1014, and A2248-50.

## STATEMENT OF RELATED CASES

There are four potentially related appeals all completed and all arising out of a related class action, In re Mushroom Direct Purchaser Antitrust Litigation, 06-620 in the United States District Court for the Eastern District of Pennsylvania. They are:

1. Case Nos. 09-2257 and 09-2258, both appealing the District Court's determination that the Defendants were not entitled to immunity under the Capper-Volstead Act. This Court in a precedential opinion held that the prejudgment order denying such immunity was not an immediately appealable order under the collateral order doctrine. Case No. 09-2258, Doc. No. 0033110633102, 8/23/2011.

2. Case Nos. 14-8134 and 14-8135, an interlocutory appeal under 28 U.S.C. §1292(b), which this Court denied. Case No. 14-8134, Doc. No. 003111807385, 12/02/2014.

3. Case Nos. 16-8079 and 16-8080, appealing the grant of class certification by the District Court under Rule 23(f) of the Federal Rules of Civil Procedure. This Court denied the Rule 23(f) petition.

4. Case. No. 19-2114, an emergency petition for a writ of mandamus, which was withdrawn by the Petitioner.

## STATEMENT OF THE CASE

### I.    THE OVERWHELMING EVIDENCE SHOWED THAT THE EMMC MEMBERS PARTICIPATED IN THE CONSPIRACY AND THAT IT WAS SUCCESSFUL.

At trial, there was overwhelming evidence that Giorgio, Modern, Kaolin, Brownstone, Oakshire, Country Fresh, Gaspari and Monterey participated in the conspiracy.  The written agreements and the testimony establish that (1) the EMMC and its members discussed and agreed to the minimum and target prices, (2) the EMMC members intended to abide by the EMMC minimum prices, (3) they did their best to do so, and (4) they did so most of the time.  All of this evidence makes the finding that the individual EMMC members listed above did not participate against the clear weight of the evidence.[1]  Specifically, the representatives of the

---

[1] The EMMC Membership Agreements for all of the Defendants, the EMMC By-Laws, and the Articles of Incorporation are: PTX-458 (Kaolin)(A2728), PTX-318 (Country Fresh)(A2579), PTX-301 (Monterey)(A2566), PTX-65 (Giorgi) (A2771), PTX-48 (Cardile)(A2515), PTX-96 (Modern)(A2538), PTX-433 (Phillips)(A2715), PTX-172 (Brownstone)(A2551), PTX-671 (Gaspari)(A2754), PTX-526 (Oakshire)(A2741), PTX-430 (EMMC ByLaws)(A2685).

above EMMC members testified at trial live or by deposition that they discussed the

EMMC minimum prices, agreed to them with fellow members during EMMC

meetings, and agreed to follow the EMMC minimum prices.[2]  Finally, several of

those representatives testified that they did their best to charge the minimum prices,[3]

they charged the minimum prices most of the time,[4] they raised their prices in order

to comply with the EMMC minimum prices,[5] the EMMC minimum prices increases

---

[2] Pia, Trial Day 2, 193:25-194:1 (A290-291), 196:5-12 (A293)(EMMC members agreed to minimum prices); Carroll, Trial Day 4, 9:2-6, 11:2-5 (When Giorgi signed the EMMC Membership Agreement, it agreed with other members to the EMMC minimum prices)(A554, A556); 13:13-16 (Giorgi was obligated to follow the EMMC minimum prices)(A558): Ciarrocchi, Day 4, 131:18-21 (Modern agreed to follow the EMMC Current Policies)(A676); Cardile, Trial Day 4, 108:25-109:2 (By joining the EMMC, Cardile agreed to abide by EMMC minimum prices)(A653-654); D'Amico, Trial Day 6, 82:12-20 (When Brownstone signed the EMMC Membership Agreement, it agreed to follow the EMMC rules and EMMC minimum prices)(A993); Brosius, 114:8-16, 114:25-116:2 (Brosius participated in discussions with fellow EMMC member to set the EMMC minimum prices)(see Final Clip Report of Brosius Deposition Designations (A2849); Schroeder, Trial Day 7, 62:22-63:4 (Oakshire Mushroom Farm agreed to sell all of the mushrooms under its control pursuant to EMMC rules, which included the EMMC minimum prices)(A1214-15), 65:5-15 (EMMC members agreed to minimum prices)(A1217), 71:18-72:8 (at the EMMC meetings, there were agreements for minimum prices)(A1223-24), 70:23-71:7 (the EMMC minimum price lists reflected agreements on minimum prices)(A1222).

[3] Phillips, Trial Day 5, 7:8-23 (A729); Kazemi, Trial Day 3, 158:11-15(A510); Cardile, Trial Day 4, p. 109:3-6(A654); Gaspari, Trial Day 6, 193 (A1104): 14-19; D'Amico, Trial Day 6, 95:15-16, 21-23 (A1106); Brosius, 121:22-122:2 (Country Fresh sought to comply with the EMMC minimum price lists), 114:4-7 (Country Fresh followed the EMMC minimum prices the best they could), and 160:16-19 (accusations that Country Fresh was not following the EMMC minimum prices were not accurate). (A2849)

[4] Cardile, Day 4, 109:10-12 (A654).

[5] Ciarrocchi, Trial Day 4, 133:13-25 (A678).

were successful or "stuck,"[6] and mushroom prices rose as a result of the EMMC minimum prices.[7]

Finally, numerous documents admitted into evidence showed that the EMMC members charged the EMMC minimum prices, the EMMC minimum price increases were successful, and the vast majority of the EMMC members were in compliance with the EMMC minimum prices and policies.  For example, Mr. Pia, the CEO of Kaolin Farms, wrote:

> On the subject of market pricing: I think you have to go back to our fathers time, or before, to find a situation which allowed us to realize the levels of fresh market pricing that we now see …. Of all the things the EMMC has done, this has to stand out as a the most significant accomplishment. Yet, it doesn't happen by magic. It happens only because each of us as members, maintains our honor and commitment to those things we have agreed to do as a team.

PTX-40 (A2511); Pia, Trial Day 2, p. 170 (EMMC feels that it can mandate a price increase)(A322), PTX-23 (A2507).   In addition, Charlie Matthews, the EMMC Executive Director, wrote:

> through cooperative pricing, the EMMC raised the average industry per pound price from a falling $1.06 to a stable $1.15.   In general, this market stabilization is still a reality.  And, if fully realized, our recent price will pump an additional $50 million into the industry.

---

[6] Kazemi, Trial Day 3, 90:11-16 (A442).
[7] Phillips, Trial Day 5, 25:11-15 (A729); Carroll, Trial Day 12, PX-390 (A2684) and 47:6-14 (referring to the "comfortable umbrella" created by the EMMC and its minimum prices)(A1903); 42:11-12 (prices in PA did go up)(A1898).

PTX-89 (A2532).[8]  Mr. Matthews also wrote:

> The vast majority of the mushrooms sold by EMMC members are in
> compliance with our agreed upon pricing and policies.

PTX-273 (A2564).[9]   See also, PTX-342 (A2593) at 246 ("Price increase
accomplished").

Mr. Schroeder, the CEO and Owner of Oakshire Mushroom Farm and
Oakshire Mushroom Sales, testified that one of the benefits of the EMMC was: "if
we work together, we could raise the price"; and "let the facts speak for themselves,"
referring to the EMMC minimum pricing. Trial Day 7, 109:3-6 and 111:5-7 (A1261,
1263). Finally, Mr. Pia wrote:

> I can tell you with 100% certainty that there is no undermining of the EMMC
> principles occurring. … Trust me when I tell you that the *honor* that started
> this effort is very much alive and well within this group.

PTX-91 (A2534)(emphasis original); PTX-51 ("John Pia stated that the EMMC has
been successful on the sales side")(A2528).

Against this overwhelming evidence, Defendants testified generally that they
did not follow the minimum prices and policies and that no one did.  However,
Defendants offered only general denials and no specific examples.  They also relied
generally on the perishable nature of mushrooms.  But again, they provided no

---

[8] Again, there was no evidence that any EMMC member criticized Mr. Matthews'
above statement at the time or contemporaneously, nor asked him to correct it, or
that he be disciplined for making the statement. Carroll, Trial Day 12, 42:13-43:6.
[9] See footnote 7.

specific examples of not following the minimum prices. And, importantly, merely pricing below the minimum prices is not sufficient to show that the minimum prices did not raise the price of fresh agaricus mushrooms. The testimony of Professor Keith Leffler, Plaintiff's economic expert, that not all of the EMMC members had to price at the minimum prices in order for the conspiracy to be successful (Trial Day 10, 50:8-13)(A1564) was not refuted or contradicted in any way by Defendants, including their economic expert.

The above evidence is important to participation, as well as competitive harm, because statements by Defendants that the minimum prices were successful demonstrates that they participated in agreeing to the minimum prices (already established by the overwhelming evidence) and carrying out the conspiracy by charging either the minimum prices or higher prices as a result of the minimum prices.

At trial, the overwhelming evidence also demonstrated that the AMC members – Cardile, Giorgi, Brownstone, Kaolin, Modern and Country Fresh – agreed to and participated in the target pricing. Indeed, the jury's finding of conspiracy includes the AMC target pricing. And Mr. Pia's testimony that the AMC members would use their best efforts to charge target pricing has not been refuted. Trial Day 3, pp. 28, 59. There was no evidence that the AMC members did not charge the target pricing or raise their prices as a result of the target pricing. In fact,

the evidence was to the contrary. Specifically, Jack Crooks, the AMC Executive Director, sent an email invoking the example of the Potato Cooperative which showed how the target pricing, even if the EMMC members did not charge the exact target pricing, would increase actual prices. PTX-832 (A2767), Trial Day 5, pp. 85-86 (A807-808). Finally, the testimony of Anthony D'Amico, the representative from Brownstone, that when they were exchanging competitively sensitive price information, the AMC members were not acting as competitors, but rather as fellow AMC members, demonstrates the participation of the AMC members. Trial Day 6, 131:6-10 (A1042). Thus, based on the overwhelming and unrefuted evidence, the above AMC members participated in the target pricing.

## II. THE OVERWHELMING AND UNDISPUTED EVIDENCE SHOWED THAT THE EMMC AND ITS MEMBERS HAD MARKET POWER, THAT THE EMMC MINIMUM PRICING AND THE AMC TARGET PRICING HAD AN IMPACT ON THE MARKET AS A WHOLE AND THAT PLAINTIFF WAS IMPACTED BY HIGHER PRICES CAUSED BY THE EMMC MINIMUM PRICES AND POLICIES AND AMC TARGET PRICES.

### A. Impact on the Market As A Whole

First, Prof. Leffler testified that the USDA data showed an impact on the market as a whole from the EMMC minimum prices: "We see the impact in the marketplace as a whole of the EMMC minimums by that big increase," and "We see the impact in the marketplace as a whole." Trial Day 10, p. 48 (A1562). In addition,

Prof. Leffler testified: "The whole marketplace is being affected by the suppression or mitigation of competition." Trial Day 10, p. 52 (A1566).

In addition, Defendants' expert, Dr. David, testified that he was not offering an opinion that the EMMC minimum prices did not increase the price of fresh agaricus mushrooms in the market (Trial Day 12, p. 148)(A2004), nor whether the EMMC and its members agreed to fix the price of fresh agaricus mushrooms. Moreover, Dr. David testified that the fact that inflation adjusted mushroom prices went down would not tell him whether there were supracompetitive prices caused by the EMMC minimum prices. Trial Day 12, p. 150:12-18(A2006).

Furthermore, the statements made by the EMMC and its members, discussed above, indicated that prices did increase due to the EMMC minimum prices and none of them mentioned that the higher prices from the EMMC minimum prices should be adjusted for inflation – not Mr. Pia, Mr. Matthews or Mr. Carroll.  In addition, Prof. Leffler testified that no producer is guaranteed the ability to achieve prices that match or keep up with inflation. Trial Day 10, 77:12-15, 78:3-19 (A1591, 1592). This testimony was not refuted by any other witness, including Defendants' economic expert.  Prof. Leffler also testified that the EMMC minimum prices actually exceeded the rate of inflation.[10]

---

[10] He testified that the prices paid by Winn-Dixie exceeded inflation (Trial Day 13, p. 32)(A2109), and that the prices paid by Winn-Dixie were at or above the EMMC minimum prices. Trial Day 10, pp. 42-47 (A1556-1561). This testimony was not refuted.

Furthermore, Dr. David testified that there was some compliance that "worked," every Defendant testified that they tried to adhere to the EMMC minimum prices, and some said that they followed them most of the time. Trial Day 12, p. 151 (A2007); see also discussion, supra, pp. 6-8. Thus, Dr. David admitted that the conspiracy did have an impact. Trial Day 12, p. 157 ("to an economist, if you're impacted by more than zero, you're impacted")(A2013). Finally, Mr. D'Amico's testimony discussed above about the AMC members not acting as competitors is also evidence of competitive harm.

Based on Dr. David's testimony, there is no evidence contradicting Prof. Leffler's testimony on the impact on the market for fresh agaricus mushrooms of the EMMC minimum prices. Moreover, that testimony is corroborated by the testimony and statements in documents discussed above. In light of the clear evidence at trial, the jury did not follow the Instruction on Proof of Competitive Harm.

## B. Market Power

Second, Prof. Leffler testified that the EMMC and its members had market power (Trial Day 10, p. 32)(A1546), including a market share of over 90% at the beginning of the EMMC and its minimum prices and 55-60% in 2005 and 2006. In addition, Jack Crooks testified to the same market share in 2005-2006. Trial Day 5, p. 63 (55-60%), and p. 26 (EMMC members had more than 50%). Dr. David confirmed that the market share at the beginning of the EMMC and its minimum

pricing was 91%. Trial Day 12, pp. 99, 173 (A1955, A2029). He also confirmed that the market share was 87% in 2002, 76% in 2003, 72% in 2004 and 58% in 2005. Trial Day 12, p. 99 (A1955); David Demonstrative Slide No. 7 (A2845). Finally, to the extent that Dr. David testified that the market share fell below 50% in 2005 and beyond, his testimony was contradicted by Mr. Crooks' testimony.

Based on the evidence above, there is undisputed evidence of the market power of the EMMC and its members from 2001 through at least 2006. See discussion below. The jury was instructed that Plaintiff could prove anticompetitive effect by proving market power. Given the undisputed evidence of market power, the jury ignored such evidence and did not follow the Instruction on Proof of Competitive Harm.

Moreover, the undisputed evidence of market share of the EMMC and its members established market power. *See, e.g.*, *Reazin v. Blue Cross & Blue Shield,* 899 F.2d 951, 967 (10th Cir. 1990) (market share between 39 and 62 percent sufficient); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 360 (7th Cir. 1990) (market share greater than 50 percent sufficient); *Graphics Prods. Distribs. v. Itek Corp.*, 717 F.2d 1560, 1570-71 (11th Cir. 1983) (70 percent market share sufficient); *Barrett v. Fields*, 924 F. Supp. 1063, 1075 (D. Kan. 1996) (50 percent market share permits

inference of market power).  There is simply no evidence from which a rational jury

could find that the EMMC lacked market power from at least 2001 through 2006.[11]

Finally, the jury's findings that a conspiracy existed is inconsistent with its

finding that there was no anticompetitive effect.  By asking for the chart from Prof.

Leffler showing the Winn-Dixie prices,[12] the jury erred in applying the law as

instructed because an anticompetitive effect is on the market as a whole, not just on

Winn-Dixie.  Defense counsel sowed this confusion with the jury when, in this

closing argument, he argued that for both a determination of anticompetitive effect

and unreasonableness, the jury should look at the effect on Winn-Dixie. Trial Day

14, pp. 148-49 (A2364-65); 152-53 (A2368-69). While Plaintiff's counsel attempted

to correct this misstatement of the law, the damage, apparently, had already been

done.

Moreover, by asking for the chart, the jury was confused about whether, in

order to prove anticompetitive effect, the impact had to be large or small. However,

any impact is sufficient to provide anticompetitive impact, regardless of the size of

the impact. Dr. David admitted this at trial: "to an economist, if you're impacted by

---

[11] Defendants appeared to argue at trial that cheating on the EMMC minimum prices
could affect market power.  David, Trial Day 12, p. 101 (A1957).  However, cheating
on a price-fixing agreement does not relate to market power.  Rather, it relates
potentially to fact of injury because market power refers to the ***ability*** of the
conspirators to raise prices, not whether they actually did so.
[12] Leffler Rebuttal Slide No. 2 (A2847).

more than zero, you're impacted." Trial Day 12, p. 157 (A2013). Therefore, this Court should grant a new trial because the jury's verdict on this question is inconsistent and against the clear weight of the evidence.

## III.    RELEVANT PROCEDURAL HISTORY

This procedural history relevant to the issues on appeal is as follows:

This case was tried to a jury from February 28, 2022 through March 22, 2022, when the jury returned its Verdict (Dkt. 493)(A2948), from which Plaintiff appeals.

As stated in the Jurisdictional Statement, on March 23, 2022, the District Court entered a Civil Judgment finding for Plaintiff on three Questions on the Verdict Form and for Defendants on one Question on the Verdict Form. Dkt. 494 (A7).   On April 20, 2022, Plaintiff timely filed a Motion for a New Trial and Judgment Notwithstanding the Verdict. Dkt. 500 (A2787).

On June 13, 2022, the District Court erroneously denied Plaintiff's Motion for a New Trial and Judgment Notwithstanding the Verdict and entered an Amended Civil Judgment (Dkt. 503)(A8-11), from which Plaintiff appeals.

In addition, the District Court issued a ruling on pending motions in limine on February 10, 2022 (Dkt. 417, Paras. 6-7)(A12), in which it granted Plaintiff's Motion in Limine to Preclude Defendants' Purported Procompetitive Benefits, which Plaintiff contends on appeal the EMMC Defendants and their counsel violated repeatedly and which the District did not enforce.

In that same Order (Dkt. 417, Par. 8), the District Court erroneously denied Plaintiff's Motion in Limine for the Application of the Quick Look Rule of Reason Analysis to the EMMC Minimum Prices and Pricing Policy (Dkt. 383).

## SUMMARY OF ARGUMENT

This Court should order a new trial based on several issues during and before the trial below.  First, this Court should order a new trial because the jury's verdict finding that there was a conspiracy to raise mushroom prices by circulating EMMC minimum and target price lists and requiring EMMC members to charge those prices is inconsistent with its finding that the EMMC participated in the conspiracy but not a single EMMC member participated in the conspiracy.  In addition, with respect to the finding that not a single EMMC members participated in the conspiracy, the jury failed to follow the law as instructed by the District Court and the finding was against the manifest weight of the evidence.

Second, this Court should order a new trial because, with respect to the jury's finding that the conspiracy caused no Competitive Harm, the jury failed to follow the law as instructed by the District Court and that finding was against the manifest weight of the evidence.

Third, this Court should order a new trial because the District Court erred as a matter of law in deciding not to apply the Quick Look Rule of Reason Analysis to the EMMC minimum prices and pricing policies and the AMC target pricing.

Fourth, this Court should order a new trial because the EMMC Defendants and their counsel made repeated references during the trial to the purpose of the EMMC and its minimum pricing as saving farms and decreasing losses. This was in direct contravention to the District Court's In Limine ruling excluding "increased producer prices, increased producer profits, decreased producer losses, or helping firms stay in operation are valid pro-competitive benefits under the rule of reason."

## STANDARD OF REVIEW

The standard of review for the District Court's decision not to apply the Quick Look Rule of Reason Analysis to the EMMC minimum prices and pricing policies and the AMC target prices is plenary because the issue solely involved a question of law. *Greenleaf v. Garlock, Inc*., 174 F.3d 352, 357 (3d Cir. 1999).

The standard of review for the arguments that the District Court erred in not granting a new trial because the jury verdict was against the manifest weight of the evidence under Rule 59(a) of the Federal Rules of Civil Procedure is deferential – whether the District Court's failure to do so was an abuse of discretion. *Id.* at 365.

The standard of review for the arguments that the jury's verdict is against the manifest weight of the evidence is when the record shows that the jury's verdict resulted in a miscarriage of justice or where the jury's verdict, on the record, cries out to be overturned or shocks the conscience of this Court. *Id.* at 366.

The standard of review for the argument that the EMMC Defendants and their counsel repeatedly violated the District Court's in limine ruling on the proper scope of procompetitive benefits is whether the improper assertions have made it "reasonably probable" that the verdict was influenced by prejudicial statements. *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994)(citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir. 1992)).

## ARGUMENT

## I.  THE DISTRICT COURT SHOULD HAVE GRANTED A NEW TRIAL BASED ON AN INCONSISTENT VERDICT AND THAT THE JURY'S VERDICT ON PARTICIPATION IN THE CONSPIRACY AND COMPETITIVE HARM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

The trial court erred when it denied Plaintiff's Rule 59(a) motion for a new trial. *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.,* 2022 U.S. Dist. LEXIS 65790 (E.D. Pa. 2022). Rule 59(a) of the Federal Rules of Civil Procedure provides, relevant part:

> *(1) Grounds for a New Trial.* The Court may, on motion, grant a new trial on all or some of the issues-and to any party-as follows:
>
> (A) after a jury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court;

Fed.R.Civ.P. 59. Pursuant to Rule 59(a), "[a] court may order a new trial upon the motion of a party or *sua sponte* where there is insufficient evidence to support the verdict or where the verdict was against the weight of the evidence." *Greenleaf v.*

*Garlock, Inc.*, 174 F.3d at 365; *citing Fed.R.Civ.P. 59(a)-(d); Wright & Miller, Federal Practice and Procedure §2806* (1995).  A motion for a new trial may also be granted pursuant to Rule 59(a) "when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand." *Buddy's Plant Plus Corp. v. Centimark Corp.,* 2014 U.S. Dist. LEXIS 43040, *5 (W.D. Pa 2014), *aff'd* 604 Fed. Appx. 134 (3d Cir. 2015), *citing Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001).  A motion for a new trial may be granted based upon inconsistent verdicts. *Malley-Duff & Assoc., Inc. v. Crown Life Ins. Co.,* 734 F.2d 133, 145 (3d Cir. 1984) ("We conclude that the answers to Questions 1, 2(A), and 2(B) may be considered inconsistent and accordingly agree with the appellee-cross appellants.  We will vacate the…verdict in the state law claims and order a new trial.")[13]

Under Rule 59(a), "the court, utilizing its authority under Rule 59(a), *should critically evaluate the evidence and exercise its discretion* in favor of a new trial because the probative evidence in their favor as contrasted with that opposed is overwhelming." *Greenleaf v. Garlock, Inc.*, 174 F.3d at 365 (emphasis in original), *see also Acumen LLC v. Advanced Surgical Serve.,* 561 F.3d 199, 220 fn. 18 (3d

---

[13] Although the Court decided *Malley-Duff* under Rule 49(a), the same reasoning applies here pursuant to Rule 59(a) because a Rule 59(a) motions may be granted "for any reason for which a new trial has been granted in an action at law in federal court…" Fed.R.Civ.P. Rule 59(A).

Cir. 2009). In considering whether a new trial is appropriate under Rule 59, the "court need not view the evidence in the light most favorable to the verdict winner, a distinction from similar motions under Rule 50." *ZF Meritor LLC v. Easton Corp., 769 F. Supp. 2d 684, 690 (D.Del. 2011), aff'd,* 696 F.3d 254 (3d Cir. 2012), c*iting McMillan v. Weeks Marine, Inc.,* 478 F. Supp. 2d 651, 655 (D. Del. 2007). Where, as here, "…a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors, a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices." *ZF Meritor LLC,* 769 F. Supp. 2d at 690; *see also Williamson v. Conrail,* 926 F.2d 1344, 1352 (3d Cir. 1991).

### A. Inconsistent Verdict on the Participation of EMMC Members in the Conspiracy to Raise Mushroom Prices.

Where a jury has returned an inconsistent verdict that has no rational explanation, a new trial should be granted pursuant to Rule 59(a). Here, the jury found that EMMC participated in a conspiracy but inexplicably found that not a single EMMC members participated. The first question on the verdict form asks:

1. Do you find by a preponderance of the evidence, that there was a single overarching conspiracy to raise the prices of agaricus mushrooms by: (1) circulating minimum or target price lists along with rules and regulations requiring EMMC members to charge those prices; and (2) acquiring properties that were historically used for mushroom farming to reduce or limit the supply of fresh agarics mushrooms, including by

placing deed restrictions on the properties to prevent their future use as mushroom farms?

The jury responded yes. Verdict Form, p. 1 (Dkt. 493). The second question on the

verdict form asks:

2. Do you find by a preponderance of the evidence, that any of the following Defendants participated in the above-described single overarching conspiracy to raise the prices of agarics mushrooms?

| DEFENDANT | Yes | No |
|---|---|---|
| a. Brownstone Mushroom Farms, Inc. | | X |
| b. C&C Carriage Mushroom Co. | | X |
| c. Country Fresh Mushroom Co. | | X |
| d. Gino Gaspari & Sons, Inc. | | X |
| e. Giorgi Mushroom Company | | X |
| f. Kaolin Mushroom Farms, Inc. | | X |
| g. Leone Pizzini and Son, Inc. | | X |
| h. Louis M. Marson, Jr., Inc. | | X |
| i. Modern Mushroom Farms, Inc. | | X |
| j. Monterey Mushrooms, Inc. | | X |

| | | |
|---|---|---|
| k. Oakshire Mushrooms Farms, Inc. | | X |
| l. Phillips Mushroom Farms, Inc. | | X |
| m. South Mill Mushroom Sales, Inc. | | X |
| n. The Eastern Mushroom Marketing Cooperative, Inc. (EMMC) | X | |
| o. To-Jo Fresh Mushrooms, Inc. | | X |
| United Mushroom Farm Cooperative, Inc. | | X |

The jury marked no for each defendant except for the EMMC. Id., p. 2.

These verdicts are conflicting and irreconcilable. As reflected in the District Court's instruction excerpted below, when the jury found in response to Question 1 that there was a conspiracy to raise mushroom prices by "circulating minimum and target price lists and requiring the EMMC members to charge those prices," and that the EMMC participated in that conspiracy (Question 2), the jury must then find, according to the instruction below, that the EMMC participated in a conspiracy with its members to raise the price of mushrooms in the market in which they competed with each other and that there was an agreement between the EMMC and its members in violation of Section 1 of the Sherman Act. Thus, the District Court instructed the jury:

> During this trial, you have heard discussion of the Eastern Mushroom Marketing Cooperative, or EMMC, which is a cooperative organization. …

> However, an association is capable of committing violations of the antitrust law. The actions of a group of competitors taken through an association to which they belong present the same issues as the actions of group of competitors who have not created a formal organization such as a trade association. A trade association or similar industry group cannot lawfully act to raise, stabilize, or maintain prices in the market in which its members compete with one another, or to reduce members' collective output of products or services. ***These actions constitute an agreement between the association and its members in violation of the Sherman Act, even if the association has not conspired with a nonmember***. Under these circumstances, the trade association or industry group is one of the co-conspirators or participants in the unlawful agreement.

Trial Day 15, 36:6-37:15 (emphasis added)(A2463-64).  When the jury found that the EMMC had participated in the conspiracy but not a single EMMC member did – including Kaolin, Modern and Monterey, the original founding members – it ignored (or failed to understand)[2] the judge's instruction that the actions of EMMC "constitute an agreement between the association and its members in violation of the Sherman Act."  In light of the above instruction, there is absolutely no rational explanation for the jury's finding that the EMMC participated in a conspiracy that did not involve a single one of its members.

In *Greenleaf*, Mr. and Mrs. Greenleaf sued Owens and Garlock, producers of asbestos, for causing the mesothelioma that killed Mr. Greenleaf.  Owens and Garlock cross-claimed against numerous other producers of asbestos who had also supplied materials to the places where Mr. Greenleaf contracted his illness.  The jury found both Owen and Garlock liable but inexplicably found that the other producers of asbestos who did not show up for the trial were not liable.  This Court granted the motion for a new trial under Rule 59 explaining that it is the appropriate remedy where "[g]iven the state of the record at the close of the evidence they had every reason to expect that the jury, if it understood and rationally applied the court's instructions, would decide that they had carried their burden of persuasion."  *Greenleaf,* 174 F.3d at 365.  Thereafter, the Court found that because "…we can find no rational explanation for the jury's failure to find

the non-appearing defendants liable as well…we are left with the definite and firm conviction that a new trial on the cross-claims is necessary to prevent a miscarriage of justice." *Id.* at 367; *see also Riley v. K Mart Corp.,* 547 U.S. 1092, 126 S. Ct. 1777, 164 L. Ed. 2d 557, 1054 (3d Cir. 1988) ("Like irreconcilable inconsistencies among answers within a set of interrogatory answers…the fundamental inconsistencies among answers in the two sets of interrogatory answers here fatally undermine the judgment entered and mandates a new trial.")

Similarly here, there is no rational explanation for the jury's finding that EMMC participated in a conspiracy but that none of its members also participated in the conspiracy. To allow such a verdict to stand would indeed constitute a miscarriage of justice.  To allow a group of defendants to form a trade association and use that association to conspire to violate the antitrust laws and yet allow the use of the trade association to shield the individual members from the consequences of their actions is the very definition of a miscarriage of justice.  It shocks the conscience, it cries out to be overturned.

**B. The Jury's Finding that Not a Single Member of the EMMC Participated in the Conspiracy Is Against the Manifest Weight of the Evidence.**

Finally, as set forth in Section I of the Statement of the Case, the overwhelming evidence at trial was that Giorgio, Modern, Kaolin, Brownstone, Oakshire, Country Fresh, Gaspari and Monterey participated in the conspiracy. The written agreements and the testimony establish that (1) the EMMC and its

members discussed and agreed to the minimum and target prices, (2) the EMMC members intended to abide by the EMMC minimum prices, (3) they did their best to do so, and (4) they did so most of the time.  All of this evidence makes the finding that the individual EMMC members listed above did not participate against the clear weight of the evidence. Specifically, the representatives of the above EMMC members testified at trial live or by deposition that they discussed the EMMC minimum prices, agreed to them with fellow members during EMMC meetings, and agreed to follow the EMMC minimum prices. Finally, several of those representatives testified that they did their best to charge the minimum prices, they charged the minimum prices most of the time, they raised their prices in order to comply with the EMMC minimum prices, the EMMC minimum prices increases were successful or "stuck," and mushroom prices rose as a result of the EMMC minimum prices.

In addition, numerous documents admitted into evidence showed that the EMMC members charged the EMMC minimum prices, the EMMC minimum price increases were successful, and the vast majority of the EMMC members were in compliance with the EMMC minimum prices and policies.  Moreover, statements by Defendants that the minimum prices were successful demonstrates not only that the EMMC minimum prices and policies harmed competition by successfully raising prices, but also that the EMMC members participated in the conspiracy by agreeing to the minimum prices (already established by the

overwhelming evidence) and carrying out the conspiracy by charging either the minimum prices or higher prices as a result of the minimum prices.

Finally, at trial, the overwhelming evidence also demonstrated that the AMC members – Cardile, Giorgi, Brownstone, Kaolin, Modern and Country Fresh – agreed to and participated in the target pricing. Indeed, the jury's finding of conspiracy includes the AMC target pricing. Thus, based on the overwhelming and unrefuted evidence, the above AMC members participated in the target pricing.

The fact that the overwhelming evidence established the participation of the above EMMC members in the conspiracy found by the jury to raise mushroom prices is an independent ground to grant a new trial because the jury's verdict that not a single EMMC member participated in the conspiracy is against the manifest weight of the evidence.

## II. THE DISTRICT COURT SHOULD HAVE GRANTED A NEW TRIAL BASED ON THE JURY'S FAILURE TO FOLLOW ITS INSTRUCTION ON COMPETITIVE HARM AND THE FACT THAT THE JURY'S VERDICT ON COMPETITIVE HARM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

When a jury has returned a verdict that is against the manifest weight of the evidence or fails to apply the law as instructed, a new trial should be ordered pursuant to Rule 59(a). Here, because the defendants controlled the vast majority of the relevant product and geographic market – fresh agaricus mushrooms in the

Eastern United States – during the relevant time period, the clear weight of the evidence shows an anticompetitive effect on the market.  In this Court, an adverse effect on competition can be proved *either* by directly proving such an effect *or* by proving that defendants possess market power.  For example, in *U.S. v. Brown University,* 5 F.3d 658, 668-69 (3d Cir. 1993), the Court stated:

> The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects, such as reduction of output…, increase in price, or deterioration of goods or services.  Such proof is often impossible to make, however, due to the difficulty of isolating the market effects of challenged conduct…Accordingly, courts typically allow proof of the defendant's "market power" instead.  Market power, the ability to raise prices above those that would prevail in a competitive market…, is essentially a "surrogate for detrimental effects." (Citations omitted).

*See also King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.,* 791 F.3d 388, 412 (3d Cir. 2015) (quoting verbatim from *Brown University* that plaintiff may prove anticompetitive effects either by proving a reduction in output or increase in price or by proving market power which is "is essentially a surrogate for detrimental effects").

Where a defendant possesses sufficient market share in a relevant market, the court will infer market power.  "Once markets are defined, we must determine whether the [defendant's] market share is sufficient to infer the existence of market power." *Gordon v. Lewistown Hosp.,* 423 F.3d 184, 211 (*3d Cir. 2005), cert. denied,* 547 U.S. 1092, 126 S. Ct. 1777, 164 L. Ed. 2d 557 (S.Ct. 2006); *see also Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.,* 2015 U.S. Dist.

LEXIS 56504, *14 (D.N.J. 2015) ("Taking all inferences in favor of the Plaintiff, the Court finds that the Plaintiff's allegation that Defendant has a 38% market share is sufficiently plausible to infer that Defendant has market power here."); *Wilk v. American Medical Ass'n,* 895 F.2d 352, 360 (7th Cir. 1990), *cert denied,* 496 U.S. 927, 110 S. Ct. 2621, 110 L. Ed. 2d 642 (S.Ct. 1990) ("The District Court properly relied on the [plaintiff's] substantial market share in finding market power."); *Graphic Prods. Distribs. v. Itek Corp.,* 717 F.2d 1560, 1570 (11th Cir. 1983) ("Market share is frequently used in litigation as a surrogate for market power for two reasons. First, market power is conceptually difficult to define in any given case. Second, its measurement requires sophisticated econometric analysis.")

At trial, witnesses for Plaintiff and Defendants testified that the EMMC and its members had a sufficient market share to infer market power. Prof. Leffler testified that the EMMC and its members had market power, including a market share of over 90% at the beginning of the EMMC and its minimum pricing and 55-60% in 2005 and 2006. Jack Crooks, executive director of the EMMC, testifying for the defendants, testified to the same market share in 2005-2006. Dr. David, an expert witness for the defendants, confirmed that the market share at the beginning the EMMC and its minimum pricing was 91%. He also confirmed the market share was 87% in 2002, 76% in 2003, 72% in 2004 and 58% in 2005. Finally, to the extent that Dr. David testified that the market share fell below 50%

in 2005 and beyond, his testimony was contradicted by Mr. Crooks' testimony. Based on the evidence presented at trial, it is undisputed that the EMMC and its members possessed more than sufficient market share during the relevant time period sufficient to infer market power from 2001 through at least 2006.

In applying these facts, the jury was instructed by the District Court that Plaintiff could meet its burden to prove anticompetitive effect by proving market power:

> To prove that the challenged restraint is unreasonable, Plaintiff must demonstrate that it has resulted in substantial harm to competition. As I mentioned earlier, harm that occurs merely to the individual business of Plaintiff is not sufficient by itself to demonstrate harm to competition generally. Rather, harm to competition must be shown in the relevant market.

> In this case, because the alleged restraint evaluated under the rule of reason includes minimum and target pricing coupled with the Supply Control Program, a harmful effect on competition refers to a reduction in competition with respect to mushroom prices that results in higher prices than there would have been absent these restraints. If the challenged conduct has not resulted in prices higher than the competitive level, then there has been no competitive harm, and you should find that the challenged conduct was not unreasonable.

> The Plaintiff can satisfy its burden either by directly proving the existence of an actual anticompetitive effect in a relevant market—in this case, higher mushroom prices than there would have been without the restraint—or by proving that the Defendants had market power in the relevant market. In determining whether the challenged conduct has produced competitive harm, you may look at the following factors:

> • the effect of the restraint on prices, output, product quality, and/or service;

> • the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed;

- any facts unique to the fresh agaricus mushroom industry; and

- whether a Defendant and its alleged co-conspirators, together, possess market power.

The last factor, market power, has been defined as an ability to profitably raise prices, for a sustained period of time, above those that would be charged in a competitive market. A firm or firms that possess market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power. The ability to charge higher prices for better products or services, however, is not market power.

An important factor in determining whether a Defendant possesses market power is the Defendant's market share, that is, its percentage of the products or services sold in the relevant market by all competitors. If Defendants do not possess a substantial market share, it is less likely that Defendants possess market power. If Defendants do not possess market power, it is less likely that the challenged restraint has resulted in a substantial harmful effect on competition in the market.

Trial Day 15, 33:25-34:21 (A2459-61).

In light of the above instruction, when it found that there was no anticompetitive harm, the jury ignored (1) (or failed to understand) the judge's instruction that a finding of market power was all that was necessary to find anticompetitive harm, and (2) the unrefuted evidence of the 90% market share held by the EMMC and its members, which, once the EMMC was established, dropped

to no lower than 55%.[14] Therefore, because the jury failed to follow the District Court's instruction that Proof of Competitive Harm could be proven by market power alone, this Court should grant a new trial.

Moreover, the failure of the jury to find anticompetitive harm is against the manifest weight of the evidence. Not only was the evidence of the market share of the EMMC and its members unrefuted, but also there was overwhelming evidence that the EMMC minimum pricing and policies had an anticompetitive effect on the market.

Prof. Leffler testified that the USDA data showed an impact on the market as a whole from the EMMC minimum prices. By contrast, Defendants' expert, Dr. David, testified that he was not offering an opinion that the EMMC minimum prices and the AMC target prices did not increase the price of fresh agaricus mushrooms in the market, nor whether the EMMC and its members agreed to fix the price of fresh agaricus mushrooms. Moreover, Dr. David testified that the fact that inflation adjusted mushroom prices went down would not tell him whether there were supracompetitive prices caused by the EMMC minimum prices.

---

[14] To the extent that the above instruction created jury confusion, this also constitutes a separate ground for granting a new trial pursuant to Rule 59(a). *Brown v. Nutrition Mgmt. Servs. Co.,* 2010 U.S. App. LEXIS 5535, * 6 (3d Cir. 2010) ("…inadvertently there was juror confusion that resulted in manifest injustice…"); *Nissho,Iwai v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1538 (5th Cir. 1984) ("A trial judge may order a new trial if he suspects that the jury verdict reflects confusion.")

Furthermore, the statements made by the EMMC and its members, discussed in the Statement of Facts, indicated that prices did increase due to the EMMC minimum prices and none of them mentioned that the higher prices from the EMMC minimum prices should be adjusted for inflation – not Mr. Pia, Mr. Matthews or Mr. Carroll. In addition, Prof. Leffler testified that no producer is guaranteed the ability to achieve prices that match or keep up with inflation. This testimony was not refuted by any other witness, including Defendants' economic expert.  Prof. Leffler also testified that the EMMC minimum prices actually exceeded the rate of inflation.

Furthermore, Dr. David testified that there was some compliance with the EMMC minimum prices that "worked," every Defendant testified that they tried to adhere to the EMMC minimum prices, and some said that they followed them most of the time. Thus, Dr. David admitted that the conspiracy did have an impact. Trial Day 12, p. 157 ("to an economist, if you're impacted by more than zero, you're impacted") (A2013). Finally, Mr. D'Amico's testimony discussed above about the AMC members not acting as competitors is also evidence of competitive harm. Finally, based on Dr. David's testimony, there is no evidence contradicting Prof. Leffler's testimony on the impact on the market for fresh agaricus mushrooms of the EMMC minimum prices. In light of the unrefuted evidence that the EMMC minimum pricing and policies had an anticompetitive effect on the market, the jury's finding that the conspiracy did not have an anticompetitive effect on competition in

the market is against the manifest weight of the evidence, and thus, this Court should grant Plaintiff a new trial.

## III. DEFENDANTS FAILED TO CARRY THEIR BURDEN ON PROCOMPETITIVE BENEFITS.

Should this Court consider entering a judgment notwithstanding the verdict, it is important that the overwhelming evidence at trial shows that there were no cognizable procompetitive benefits to the EMMC minimum pricing and policies and the AMC target prices.  Under a rule of reason analysis, once competitive harm has been established, the burden shifts to Defendants to show pro-competitive benefits. "If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective…To rebut, the plaintiff must demonstrate the the restraint is not reasonably necessary to achieve the stated objective. *Deutscher Tennis Bund v. ATP Tour, Inc.,* 610 F.3d 820, 830 (3d Cir. 2010), *cert denied,* 562 U.S. 1064, 131 S. Ct. 658, 178 L. Ed. 2d 482 (S.Ct. 2010), *citing U.S. v. Brown University,* 5 F.3d at 668-69.  Once the plaintiff has met its burden to show anticompetitive effects, "[u]nder the Rule of Reason, these hallmarks of anticompetitive behavior place upon petitioner a heavy burden of establishing an affirmative defense which competitively justifies this apparent deviation from the operations of a free

market." *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 113 (1984).

First, Dr. David, Defendants' expert witness, offered no opinion on pro-competitive benefits at trial.  Second, while the defendants spent a lot of time at trial on the issue of farm closings, preventing farms from closing, decreasing losses and improving profitability and prices, the Court, as noted above, instructed the jury that it may not consider any of those issues as legitimate pro-competitive benefits.  Third, the only arguably procompetitive benefit – marketing – was shown at trial to be a sham excuse for the EMMC's price-fixing and supply control scheme.  Finally, even if the evidence did not show that marketing was a sham excuse, Plaintiff presented evidence that Defendants did not need to engage in the EMMC minimum prices and policies and the AMC target prices in order to engage in marketing; in other words, there were less anticompetitive means for Defendants to engage in marketing.

Plaintiff presented evidence at trial that marketing was not begun in earnest until sometime in 2003, while the minimum pricing was begun in 2001.  PTX-390 (A2684); Carroll, Trial Day 12, p. 45 ("promotion" by EMMC had not started yet)(A1898); D'Amico. Trial Day 6, 174:12-14 (EMMC didn't get around to the marketing program until 2003)(A1085); PTX-798 at 3 ("we started in 2001 with a plan to improve our stations in life and took immediate and important step of

pricing.")(A2784). Similarly, the supply control program was first discussed in April 2001 and was started in mid 2001. PTX-51 (A2528).

One of the purported reasons why the EMMC marketing campaign took at least two years to begin was the high cost, estimated by Mr. Ciarrocchi, CEO of Defendant Modern Mushroom, to be between $6-$8 million. Trial Day 4, p. 140 (A685). However, the EMMC and its members raised and spent $4-$6 million on the Supply Control program. Trial Day 6, p. 125 (A1036); Schroeder, Trial Day 7, 128:16-22 (A1280). Because the EMMC and its members were able to raise and spend $4-6 million on the Supply Control program, they could have raised and spent that amount on marketing and done so in 2001. Thus, any contention that the minimum pricing and target prices were justified as a marketing mechanism is against the manifest weight of the evidence. Thus, the evidence at trial is such that no reasonable jury could find that there were legitimate procompetitive benefits and, if there were, there were less anticompetitive means to achieve those procompetitive benefits. Therefore, based on the overwhelming evidence at trial, Defendants failed to meet their burden to establish any procompetitive benefit from the EMMC minimum pricing and policies and the AMC target prices and Plaintiff met its burden to show that the minimum pricing and target prices were not necessary in order to achieve the purported procompetitive benefit of marketing.

## IV. THE JURY'S FAILURE TO FOLLOW CERTAIN JURY INSTRUCTIONS WARRANTS A NEW TRIAL.

It is well established that the failure of a jury to follow the Court's instruction is a proper ground for a new trial pursuant to Rule 59(a). *Shushereba v. R. B. Industries, Inc.*, 104 F.R.D. 524, 528 (W.D. Pa. 1985); see 6 A.J. Moore, Moore's Federal Practice, P59.08[4] (2d ed. 1983); *Rose v. Brown Mach. Div.*, 1995 U.S. Dist. LEXIS 3566, at *9 (E.D.Pa. 1995) ("...I find that since the jury did not follow the law as instructed, a grant of a new trial is required in this matter."); *Gardner v. Vogel*, 237 F. Supp. 119, 121 (E.D. Pa. 1964); *EEOC v. Delaware Dep't of Health & Social Services,* 667 F. Supp. 1057, 1068 (D. Del. 1987); *Elia v. Roberts*, 2019 U.S. Dist. LEXIS 169311, at *5 (E.D. Cal. 2019); *Thomas v. Stalter*, 20 F.3d 298, 303 (7th Cir. 1994); *J.A. Jones Constr. Co. v. Steel Erectors, Inc.*, 901 F. 2d 943, 944 (11th Cir. 1990). In *EEOC v. DHSS*, the court elaborated on the circumstances in which a jury may fail to follow a court's instructions thereby necessitating a new trial to avoid injustice:

> When it appears from the verdict that the jury was confused about the court's instructions and that such confusion has prejudiced the party moving for a new trial, it is within the court's discretion to grant a new trial in the interest of justice. *Nissho-Iwai Co. Ltd. v. Occidental Crude Sales*, 729 F.2d 1530, 1538 (5th Cir. 1984); *McCormick v. City of Wildwood*, 439 F. Supp. 769, 773 (D. N.J. 1977) (quoting *Colonell v. Goodman*, 78 F. Supp. 845, 849 (E. D. Pa.), *aff'd* 169 F.2d 275 (3d Cir.), *cert. denied*, 335 U.S. 870, 93 L. Ed. 414, 69 S. Ct. 166 (1948)). The same is true when it appears that the jury has consciously failed to follow the court's instructions, causing prejudice to the moving party. *Shushereba v. R.B. Industries, Inc.*, 104 F.R.D. 524,529 (W.

D. Pa. 1985); *McCormick, supra*, 439 F. Supp. at 773; *see also Feinberg v. Mathai*, 60 F.R.D. 69, 71 (E. D. Pa. 1973); 6A *Moore's*, para. 59.08[4], at 59-124 to 59-125.

In this case, whether due to confusion or to a conscious failure to adhere to the law given to it, the jury's conclusion that Bloom and the PHNs all worked under similar working conditions misconstrues the applicable law. It is also clear that the DHSS was prejudiced by this failure, since a correct application of the law would have led the jury to find in the DHSS's favor against at least ten of the PHNs. We must, therefore, grant a new trial in order to avoid injustice.

667 F. Supp. at 1068. In the instant case, either by confusion or consciously, the jury here failed to follow this Court's instructions, specifically the Instructions on Participation, Trade Organizations and Proof of Competitive Harm in the Relevant Market and that Plaintiff was prejudiced as a result. This alone warrants the grant of new trial.

## V. THE COURT ERRED IN DENYING PLAINTIFF'S MOTION IN LIMINE FOR THE APPLICATION OF THE QUICK LOOK RULE OF REASON ANALYSIS TO THE EMMC MINIMUM PRICES AND PRICING POLICY.

The court erred when it denied the plaintiffs' *Motion in Limine for the Application of the Quick Look Rule of Reason Analysis to the EMMC Minimum Prices and Pricing Policy.* The Courts have embraced a Quick Look analysis in cases, such as this one, where an intermediate approach between per se and the rule of reason standard is necessary. "In addition to the traditional rule of reason and the per se rule, courts sometimes apply what amounts to an abbreviated or "quick

look" rule of reason analysis. The abbreviated rule of reason is an intermediate

standard." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993).

> It is "an intermediate standard" and "applies in cases where *per se*
> condemnation is inappropriate but where no elaborate industry analysis is
> required to demonstrate the anticompetitve character of an inherently suspect
> restraint." *Brown*, 5 F.3d at 669 (internal quotation marks omitted); *see FTC
> v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459, 106 S. Ct. 2009, 90 L. Ed. 2d
> 445 (1986); *NCAA*, 468 U.S. at 109 (1984); *Prof'l Eng'rs*, 435 U.S. at 692. In
> such cases, "an observer with even a rudimentary understanding of
> economics could conclude that the arrangements in question would have an
> anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*,
> 526 U.S. 756, 770, 119 S. Ct. 1604, 143 L. Ed. 2d 935 (1999). In other words,
> "quick-look analysis carries the day when the great likelihood of
> anticompetitive effects can easily be ascertained." *Id*. Under "quick look"
> analysis, the competitive harm is presumed, and "the defendant must
> promulgate 'some competitive justification' for the restraint." *Brown*, 5 F.3d
> at 669 (quoting *NCAA*, 468 U.S. at 110). "If no legitimate justifications are
> set forth, the presumption of adverse competitive impact prevails and 'the
> court condemns the practice without ado.'" *Id*. (quoting *Chicago Prof'l Sports
> Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992)). "If the defendant
> offers sound pro-competitive justifications, however, the court must proceed
> to weigh the overall reasonableness of the restraint using a full-scale rule of
> reason analysis." *Id*.

*Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d at 830-31.  "Some restraints of

trade are 'highly suspicious' yet 'sufficiently idiosyncratic that judicial experience

with them is limited…Per se condemnation is inappropriate, but at the same time,

the 'inherently suspect' nature of the restraint obviates the sort of 'elaborate

industry analysis' required by the traditional rule-of-reason standard." *In re Ins.

Brokerage Antitrust Litig*., 618 F.3d 300, 317 (3d Cir. 2010).  "This is…an

important issue because the quick-look analysis not only relieves the plaintiff of

the burden of showing anticompetitive effects in the relevant market as part of their *prima facie* case, it also shifts the burden to defendants 'to show empirical evidence of procompetitive effects.'" *Realcomp II Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011).

It is axiomatic that price fixing is a paradigmatic per se case. "Price is the central nervous system of the economy…and an agreement that 'interferes' with the setting of price by free market forces' is illegal on its face…" *National Society of Engineers v. US.*, 435 U.S. 679, 692 (1978) (citations omitted). It is further axiomatic that a supply control restriction is a paradigmatic per se violation. "Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. at 107. Thus, where the alleged antitrust violation is a price fixing mechanism, but is outside the scope of the per se rule, the courts have used the quick look method. In *Brown University*, the court held that because the "…Agreement is a price fixing mechanism impeding the ordinary functioning of the free market, [defendant] is obliged to provide justification for the arrangement."). 5 F.3d at 668. Similarly, this case involves a price fixing scheme which would be analyzed under the per se rule but for the vertical elements of the scheme.

Despite this well-established principle of antitrust jurisprudence, the District Court held: "The court finds the quick look analysis is not appropriate here

*because the effects of the minimum pricing policy are not 'obviously and facially anticompetitive.'" Winn-Dixie Stores, Inc. v. E. Mushroom Mktg Coop.,* 2022 U.S. Dist. LEXIS 65790 (E.D. Pa 2022), *citing Food Lion LLC v. Dean Foods Co.,* Civ. A. No. 07-188, 2016 U.S. Dist. LEXIS 42180, 2016 WL 1259959 at *4, (emphasis added). Such a finding flies in the face of longstanding antitrust precedent. There is no question that the price fixing in this case, as in all cases, is an inherently suspect restraint. Thus, no elaborate industry analysis is required to demonstrate the anticompetitive character of the price fixing and supply control scheme. "…[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an arrangement.'" *National Collegiate Athletic Ass'n v. Board of Regents,* 468 U.S. at 113. *See also National Society of Engineers v. U.S.,* 435 U.S. at 692 (same). Further, "an observer with even a rudimentary understanding of economics could conclude" that the scheme in question here "would have an anticompetitive effect on customers and markets." *Deutscher Tennis Bund v. ATP Tour, Inc.,* 610 F.3d at 830-31. Thus, the District Court should have applied the Quick Look Analysis in this case, and its error in not doing so warrants a new trial.[15]

---

[15] *Food Lion*, the only case cited by the Court, does not involve a price fixing scheme at all, but rather involves a scheme whereby defendant "accepted 'second best' plants, operated those plants at losses and eventually shuttered some of those plants in an unlawful agreement with its competitor…because, in return, its parent

## VI. REPEATED REFERENCES TO SAVING FARMS AND DECREASING LOSSES BY THE EMMC DEFENDANTS AND THEIR COUNSEL, IN VIOLATION OF THE DISTRICT COURT'S IN LIMINE ORDER, WARRANTS A NEW TRIAL.

At trial, the EMMC Defendants and their counsel made repeated references to the purpose of the EMMC and its minimum pricing as saving farms and decreasing losses. This was in direct contravention to the District Court's In Limine ruling excluding "increased producer prices, increased producer profits, decreased producer losses, or helping firms stay in operation are valid pro-competitive benefits under the rule of reason." Because of the pervasive nature of the references of the EMMC Defendants and their counsel to this excluded evidence, Plaintiff is entitled to a new trial.

Prior to trial, the District Court ruled in limine:

5. EMMC's Motion in Limine Regarding the Court's Order of February 14, 2020 in the Publix and Giant Eagle Cases, Precluding Evidence of Certain Pro-Competitive Attributes of the EMMC's Minimum Pricing Policy (Dkt. 380) is **DENIED**. As the Court noted in that Order, "the Sherman Act does not permit defendants to justify anticompetitive behavior by arguing that the behavior forestalls certain negative consequences where those consequences are the result of competition." Accordingly, **the EMMC will not be permitted to argue that increased producer prices, increased producer profits, decreased producer losses, or helping firms stay in operation are valid pro-competitive benefits under the rule of reason.** (Emphasis Added).

---

company…received a commitment from [it's competitor] to allow it to supply [product] to each [competitor's] bottling plant, including pre-merger [competitor] plants previously supplied by independent [competitors]. *Food Lion,* 2016 U.S. Dist. LEXIS 42180 at *10.

6.  Winn-Dixie's Motion in Limine to Preclude Defendants' Purported Procompetitive Benefits (Dkt. 381) is **GRANTED** for substantially the same reasons as set forth in the Court's decision regarding Dkt. 380.

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative, et al,* Order, February 22, 2022 (Dkt. 417)(A12).  In contravention of this ruling, the EMMC Defendants and their counsel repeatedly elicited testimony regarding how the EMMC minimum pricing policy was necessary to keep farmers in business, forcing counsel for Plaintiff to object in front to the jury. For example, on Day 2 of the trial, with the very first witness from the Defendants to take the stand, the following exchange took place:

A.  The purpose of the existence of the EMMC was to allow growers who for three and sometimes four generations of farmers *to survive at a time where we were right about up to here,* and my job-

> (The record will reflect *he's pointing to his neck*)

> MR. AHERN: Your honor, this is out of bounds with respect to the motion of limiting [sic] rule of (indiscernible).

> THE COURT: Listen.  Did you read the whole letter you wrote?

> THE WITNESS: Would I read it?

> THE COURT: Did you read it? You said you wrote it.

> THE WITNESS: Oh, I'm very familiar with this letter. I started the organization.  I had to step down, because the organization was falling apart.  I can recite that letter from memory almost.  It wasn't a good day for me.

> THE COURT: All right. Move on.

Trial Transcript, 2/28/2022, Trial Day 2, 205:20-206:1 (A301-302).  On Day 6, the

following exchange occurred:

> MR. AHERN: The other thing, Your Honor, is we keep getting these, oh my
> farm would have gone out of business, my farm would have gone out of
> business.  That's out of bounds based on-
>
> THE COURT: It's not out of bounds.
>
> MR. AHERN: their own [pro] competitive
>
> benefits.
>
> THE COURT: It's not out of bounds.
>
> MS. SHIELDS: That's the reason why they signed.
>
> (Cross talk)
>
> MR. AHERN: But may we have the limine instruction, because there's been
> a lot of this.  So, may we have a limine instruction from the bench?
>
> MR. AHERN: Saying that the jury may not consider whether or not the
> purpose the EMMC was to decrease losses, improve profitability, save
> farms, basically the four things that Your Honor said in the MIL, because
> they are really getting this stuff in, and they really shouldn't even be
> volunteering it.
>
> MR. DESTEFANO: We're not even at the pro-competitive benefits state of
> the case yet.
>
> MR. AHERN: It's the record.
>
> MR. DESTEFANO: No, it's not the record.
>
> MR. AHERN: You want to wait until there's jury instructions, but the jury's
> already going to have that in its mind.  So I would just ask Your Honor to
> consider this.
>
> THE COURT: I'll consider it.

Trial Day 6 102:13-103:13 (emphasis added) (A1013-14). During the jury instruction conference, counsel for the EMMC defendants attempted to keep the MIL language out of the jury instructions altogether.

> MR. BRUNELLI: Your Honor, whether or not you made that, we don't dispute that you made a ruling, you can actually- -you know, pretrial ruling on this issue, but we see no reason for you, Your Honor, to specifically quote language from that order in this instruction. That order precluded the Defendants from arguing- -from offering certain evidence at trial relating to, I think it was increased prices and increased losses, whatever the language was. So, okay, that was a pretrial ruling. We see no reason for that to make its way into the charge to the Jury.

> MR. AHERN: Well, they put on evidence that the whole purpose of this thing was to help farms stay in business.

> …

> MR. BRUNELLI: Your Honor, if Counsel thought the evidence that came in at trial violated Your Honor's prior court ruling, I'm sure he would have objected at the time or maybe even filed a motion to challenge it. He never did.

> …

> MR. AHERN: I did.  But - - I did, I came up and talked about surviving farms.  We had sidebars on that…

> THE COURT: Well, are you now saying that they introduced what I told them not to as evidence in the case?

> MR. AHERN: Yes.  And I- -when they were talking about farms surviving, I was objecting. But more importantly, you said this- -you can't consider this.

> …

Trial Day 14, 32:21-34:5 (A2248-50).

The introduction of this specifically prohibited evidence throughout the trial, has made it "reasonably probably" that the verdict was influenced by the prejudicial statements. "In this circuit, the test for determining whether to grant a new trial in cases involving counsel misconduct is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994)(citing *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir. 1992).

Further, it is reasonably probable that the introduction of the improper statements confused the jury and lead to the inconsistent verdict. "While zealous advocacy can sometimes lead to minor misconduct that would not warrant a new trial, in this case the Court determines that the repeated misconduct of Sabert's counsel on a wide variety of fronts requires a new trial, particularly in light of the jury's inconsistent verdict." *Waddington North Am., Inc. v. Sabert,* 2011 U.S. Dist. LEXIS 86632, *12 (D.N.J. 2011). Where, as here, the improper statements are introduced repeatedly, opposing counsel need not object to every instance. Indeed, to do so risks alienating the jury and giving them the impression that he is attempting to keep them from learning relevant or harmful information.

> …in cases where the misconduct at issue is substantial or repeated, such as this one, a new trial is warranted even if opposing counsel does not object to every single violation. *See Draper v. Airco, Inc.*, 580 F.2d 91 (3d Cir.

1978) (finding a closing prejudicial despite a curative instruction where there were several violations including improper references to defendant's wealth, personal opinion of the justness of the cause of action, and referring to information not in evidence); *Kiewit Sons' Co.*, 624 F.2d 749, 758-59 (6th Cir. 1980) (ordering a new trial despite the fact that the Court repeatedly gave curative instructions). In instances where misconduct is constant and repeated, counsel cannot object to every transgression — there are simply too many transgressions. Indeed, such constant misconduct puts opposing counsel in lose-lose situation requiring counsel to either object and be seen as combative, or allow the misconduct to continue. *See Straub v. Reading Co.*, 220 F.2d 177, 181 (3d Cir. 1955). In this case, as mapped below, Mr. Sutton's misconduct was so constant and repeated that if WNA had objected to every issue, the stream of objections would have ground the proceeding to a halt, and given the jury the impression that counsel for WNA was angry, combative, and attempting to keep relevant evidence from it. Thus, counsel for WNA can hardly be faulted for failing to object to the thirtieth transgression of the day at trial. Indeed, the Court notes that WNA likely erred on the side of objecting frequently, so frequently that its proper objections likely prejudiced its position with the jury. *North Am., Inc. v. Sabert,* 2011 U.S. Dist. LEXIS 86632 at *12-14.

*Waddington North Am., Inc. v. Sabert,* 2011 U.S. Dist. LEXIS 86632 at *12.

Similarly, here, Plaintiff's counsel was in a position of having to choose to continually object, giving the jury the impression he was attempting to keep relevant information from them, or allowing the statements to go unchecked, giving the jury the impression that they could determine that saving farms was a procompetitive benefit that justified the violation of the antitrust laws. The end result, of course, is that the jury was confused and issued an inconsistent verdict on the issue of Competitive Harm, to which the Rule of Reason obviously relates.

# **CONCLUSION**

The Court should reverse the judgment entered by the District Court and grant Plaintiff a new trial.


Dated: October 24, 2022                    Respectfully submitted,


                                           */s/ Patrick J. Ahern*
                                           Patrick J. Ahern
                                           AHERN AND ASSOCIATES, P.C.
                                           8 S. Michigan Ave.
                                           Suite 3600
                                           Chicago, IL 60603
                                           patrick.ahern@ahernandassociatespc.com

                                           *Counsel for Plaintiff-Appellant Winn-Dixie Stores, Inc.*

## <u>CERTIFICATION OF ADMISSION TO BAR</u>

I, Patrick J. Ahern, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: October 24, 2022

/s/ Patrick J. Ahern
Patrick J. Ahern

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 12,186 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using 2008 version of Microsoft Word in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: October 24, 2022

By: /s/ Patrick J. Ahern
Patrick J. Ahern
_____

## **CERTIFICATE OF FILING AND SERVICE**

I certify that on this 24th day of October 2022, the foregoing Brief and

Appendix Volume 1 were filed through CM/ECF system and served on all parties

or their counsel of record through the CM/ECF system.

Dated: October 24, 2022

By: /s/ Patrick J. Ahern
Patrick J. Ahern

**APPENDIX**

i

## TABLE OF CONTENTS

**Page**

**Volume 1 of 7**

Plaintiffs' Notice of Appeal, dated July 13, 2022 .....     A1

Defendants' Conditional Notice of Cross-Appeal,
    dated July 27, 2022 .................................................     A4

Judgment, dated March 23, 2022...............................     A7

Order, dated June 13, 2022 .......................................     A8

Order, dated February 10, 2022 ................................     A12

**Volume 2 of 7**

District Court Docket Entries ....................................     A20

Trial Transcript, dated February 28, 2022 (Day 1)....     A94

Trial Transcript, dated March 1, 2022 (Day 2) ..........     A153

Trial Transcript, dated March 2, 2022 (Day 3) ..........     A353

**Volume 3 of 7**

Trial Transcript, dated March 3, 2022 (Day 4) ..........     A546

Trial Transcript, dated March 4, 2022 (Day 5) ..........     A723

Trial Transcript, dated March 7, 2022 (Day 6) ..........     A912

**Volume 4 of 7**

Trial Transcript, dated March 8, 2022 (Day 7) ..........     A1153

Trial Transcript, dated March 9, 2022 (Day 8) ..........     A1369

Trial Transcript, dated March 14, 2022 (Day 10) ......     A1515

ii

                                                                    **Page**

**Volume 5 of 7**

Trial Transcript, dated March 15, 2022 (Day 11) ...... A1713

Trial Transcript, dated March 16, 2022 (Day 12) ...... A1857

Trial Transcript, dated March 17, 2022 (Day 13) ...... A2078

**Volume 6 of 7**

Trial Transcript, dated March 18, 2022 (Day 14) ...... A2217

Trial Transcript, dated March 21, 2022 (Day 15) ...... A2428

Verdict Form, dated March 21, 2022 ........................ A2498

*Plaintiff's Trial Exhibits (PTX):*

PTX 023 – E-mail, dated April 18, 2002 .................. A2507

PTX 040 – E-mail, dated July 3, 2001 ...................... A2511

PTX 048 – Easter Mushroom Marketing
         Cooperative ("EMMC") Amended
         Membership Agreement and Certificate of
         Membership, dated August 23, 2005 ................ A2515

PTX 051 – Minutes of May 8, 2001 General
         Meeting of EMMC ............................................ A2528

PTX 089 – Newsletter for EMMC Members, dated
         March 30, 2003 ................................................ A2532

PTX 091 – E-mail, dated April 21, 2001 .................. A2534

PTX 096 – EMMC Membership Agreement and
         Certificate of Membership, dated
         January 9, 2001 ................................................ A2538

PTX 172 – EMMC Membership Agreement and
         Certificate of Membership, dated
         January 9, 2001 ................................................ A2551

iii

**Page**

PTX 273 – Newsletter for EMMC Members, dated December 27, 2004 ............................................. A2564

PTX 301 – EMMC Membership Agreement and Certificate of Membership, dated January 9, 2001 ................................................ A2566

PTX 318 – EMMC Membership Agreement and Certificate of Membership, dated September 26, 2001 ........................................... A2579

PTX 342 – Minutes of Various General Meetings of EMMC ............................................................... A2593

PTX 390 – E-mail, dated October 20, 2002 ............. A2684

PTX 430 – Bylaws of EMMC ................................... A2685

PTX 433 – EMMC Amended Membership Agreement and Certificate of Membership, dated August 9, 2005......................................... A2715

PTX 458 – EMMC Membership Agreement and Certificate of Membership, dated January 9, 2001 ................................................ A2728

PTX 526 – EMMC Membership Agreement and Certificate of Membership, dated January 8, 2001 ................................................ A2741

PTX 671 – EMMC Membership Agreement and Certificate of Membership, dated January 9, 2001 ................................................ A2754

PTX 832 – E-mail, dated March 1, 2007 ................... A2767

PTX 065 – EMMC Membership Agreement and Certificate of Membership, dated January 9, 2001 ................................................ A2771

iv

|  | Page |
|---|---|
| PTX 798 – E-mail, dated March 29, 2006 | A2784 |

**Volume 7 of 7 - FILED UNDER SEAL**

Plaintiff's Rule 50(b) Motion for a Judgment
Notwithstanding the Verdict and Rule 59(a)
Motion for a New Trial, dated April 20, 2022 ....... A2787

Exhibit 1 –
Trial Designations .................................................. A2812

Exhibit 2 –
Demonstrative Slide .............................................. A2845

Exhibit 3 –
Demonstrative Slide .............................................. A2847

Exhibit 4 –
Final Designations ................................................ A2849

Exhibit 5 –
Demonstrative Slide .............................................. A2863

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **WINN-DIXIE STORES, INC. and BI-LO HOLDINGS, LLC.** | **No. 15-cv-6480** |
| **Plaintiffs,** | **Related Action:** |
|  | **Master File No. 06-cv-0620** |
| **v.** |  |
| **EASTERN MUSHROOM MARKETING COOPERATIVE, INC., et al.,** |  |
| **Defendants** |  |

### PLAINTIFFS' NOTICE OF APPEAL

Notice is hereby given that Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC appeal to the United States Court of Appeals for the Third Circuit from the Civil Judgment (ECF Doc. No. 494) entered in this action on March 23, 2022 and from the Amended Civil Judgment (ECF Doc. No. 503) entered in this action on June 13, 2022 granting judgment in favor of Defendants Brownstone Mushroom Farms, Inc.; C&C Carriage Mushroom Co.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Giorgi Mushroom Company; Kaolin Mushroom Farms, Inc.; Leone Pizzini and Son, Inc.; Louis M. Marson, Jr. Inc.; Modern Mushroom Farms, Inc.; Monterey Mushrooms, Inc.; Phillips Mushrooms, Inc.; Oakshire Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; Eastern Mushroom Marketing Cooperative, Inc. (EMMC); To-Jo Fresh Mushrooms, Inc. and United Mushroom Farm Cooperative, Inc., and against Plaintiff Winn-Dixie Stores, Inc., and Plaintiffs appeal all interlocutory or other orders subsidiary or relating thereto.

1

A1

Dated: July 13, 2022

Respectfully submitted,

/s/ Patrick J. Ahern
Patrick J. Ahern
AHERN AND ASSOCIATES, P.C.
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Tel: (312) 404-3760
patrick.ahern@ahernandassociatespc.com
*Counsel for Plaintiff Winn-Dixie Stores, Inc.
and Bi-Lo Holdings, LLC*

A2

**CERTIFICATE OF SERVICE**

I, Patrick J. Ahern, hereby certify that on July 13, 2022, I caused a copy of the foregoing document to be uploaded to the Court's CM/ECF system, where it is available for downloading and viewing.

/s/ Patrick J. Ahern

Patrick J. Ahern

A3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WINN-DIXIE STORES, INC. and | : | |
| BI-L) HOLDINGS, LLC | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs* | : | |
| v. | : | |
| | : | **No. 15-cv-6480** |
| EASTERN MUSHROOM MARKETING | : | |
| COOPERATIVE, INC., et al. | : | |
| | : | |
| *Defendants*. | : | |

**NOTICE OF CONDITIONAL CROSS APPEAL**

Notice is hereby given that Defendants, Brownstone Mushroom Farms, Inc.; C&C

Carriage Mushroom Co.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Giorgi

Mushroom Company; Kaolin Mushroom Farms, Inc.; Modern Mushroom Farms, Inc.; Monterey

Mushrooms, Inc.; Phillips Mushrooms, Inc.; Oakshire Mushroom Farm, Inc.; South Mill

Mushroom Sales, Inc.; To-Jo Fresh Mushrooms, Inc. and Eastern Mushroom Marketing

Cooperative, Inc. (EMMC), conditionally cross appeal to the United States Court of Appeals for

the Third Circuit from the Order and Civil Judgment entered by the District Court on June 13,

2022 in favor of Defendants and against Plaintiff .

This Cross Appeal is expressly contingent on a decision by the Court of Appeals to

vacate the Civil Judgment in favor of all Defendants entered on June 13, 2022 and thus, the

issues addressed by this Cross Appeal need only be reached if the Court of Appeals reverses the

District Court's July 13, 2022 Judgment in favor of the Defendants.

This Cross Appeal concerns certain Pre-Trial Orders entered by the District Court 1)

holding that the EMMC and/or its member agricultural producers as well as their affiliated

A4

distributors are not immune from claims under Section 1 of the Sherman Act by virtue of the

Capper Volstead Act; 2) precluding the Defendants from offering evidence that they relied in

good faith on the advice of counsel regarding an agricultural cooperative's ability to engage

various activities alleged to constitute an Overarching Conspiracy in violation of Section 1 of the

Sherman Act; and 3) holding that EMMC's so called Supply Control activities were not subject

to consideration by the finder of fact under the Rule of Reason.

Dated: July 27, 2022

                                          Respectfully Submitted,

                                          */s/  William A. DeStefano*
                                          William A. DeStefano
                                          Terri A. Pawelski
                                          Matthew C. Brunelli
                                          **STEVENS & LEE**
                                          1500 Market Street – East Tower
                                          Suite 1800
                                          Philadelphia, PA 19102

2

A5

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2022 I caused a copy of the foregoing document to be uploaded to the Court's ECF system where it is available for review by all parties to this litigation.

Dated: July 27, 2022

*/s/ William A. DeStefano*

3

A6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.* | : | **NO. 5:15-6480** |

## CIVIL JUDGMENT

**AND NOW**, this 23rd day of March, 2022, in accordance with the Court's interrogatories to the jury, it is **ORDERED** that Judgment is entered in favor of plaintiff with regard to the following:

1. There was a single overarching conspiracy to raise the prices of agaricus mushrooms by: (a) circulating minimum or target price lists along with rules and regulations requiring EMMC members to charge those prices; and (b) acquiring properties that were historically used for mushroom farming to reduce or limit the supply of fresh agaricus mushrooms, including by placing deed restrictions on the properties to prevent their future use as mushrooms farms.

2. Defendant Eastern Mushroom Marketing Cooperative participated in the conspiracy to raise prices of agaricus mushrooms; no other listed defendants participated.

3. Defendant Oakshire Mushroom Farms, Inc. and Oakshire Mushroom Sales, LLC, satisfied the ownership and control exception to the indirect purchaser rule as explained by the Court.

It is further **ORDERED** that Judgment is entered in favor of defendants with regard to the following:

1. The single overarching conspiracy was not anticompetitive in that it did not cause the price of fresh agaricus mushrooms to be higher than it would have otherwise been.

**BY THE COURT:**

**ATTEST:** _____

*Deputy Clerk*

A7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.*, | : | **No. 15-6480** |
| **Defendants.** | : | |

## <u>ORDER</u>

**AND NOW**, this **13th** day of **June, 2022**, upon consideration of the following motions, and the responses and replies thereto, it is **ORDERED** that:

1. Plaintiff's Rule 50(b) Motion for a Judgment Notwithstanding the Verdict and Rule 59(a) Motion for a New Trial (Dkt. 500) is **DENIED**.[1]

---

[1]     After a 14-day trial over the course of four weeks in February and March 2022—nearly six and a half years after this action began and over 15 years after the original class action giving rise to this case was filed—a 10-member jury unanimously found that Plaintiff failed to carry its burden in this antitrust litigation. Specifically, the jury concluded that the EMMC initiated a conspiracy to raise the price of *agarcius* mushrooms through the use of minimum or target price lists and by acquiring properties historically used for mushroom farming to reduce or limit the supply of fresh *agaricus* mushrooms. But the jury found that Plaintiff failed to show other Defendants joined the conspiracy and that Plaintiff did not prove that the conspiracy had anticompetitive effects in the market. Accordingly, the jury did not need to analyze whether Plaintiff satisfied the rest of its evidentiary burdens or determine the amount of Plaintiff's damages.

After trial, Plaintiff filed a motion seeking relief from the jury's findings under Federal Rules of Civil Procedure 50(b) and 59(a). (*See* Dkt. 500 [Mot.].) For the reasons that follow, the motion is denied.

Federal Rule of Civil Procedure 50(b) allows a party to "file a renewed motion for judgment as a matter of law" within "28 days after the entry of judgment." "In ruling on" such a motion, a court may allow the judgment to stand, order a new trial, or enter judgment for the movant. Fed. R. Civ. P. 50(b)(1)-(3). Here, Plaintiff argues the jury's findings were internally inconsistent, the jury was confused by the Court's instructions, and the verdict is against the weight of the evidence. (*See* Mot. at 1-2.) Plaintiff requests the Court overturn the jury's conclusions, find in its favor on all remaining aspects of its claim, and award damages. (*Id.* at 2.)

However, courts "can only address issues raised in a Rule 50(b) motion which were first raised in a timely Rule 50(a) motion." *Mathis v. Borough of Old Forge*, Civ. A. No. 08-1240, 2021 WL 639018, at *3 (M.D. Pa. Feb. 18, 2021) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d

1153, 1172 (3d Cir. 1993)). This requirement is rooted in the text of Rule 50(b) itself, which refers to "a *renewed* motion for judgment as a matter of law." Fed. R. Civ. P. 50(b) (emphasis added). As the Third Circuit has explained, filing a Rule 50(a) motion is a mandatory prerequisite to a Rule 50(b) motion because "judicial reexamination of the evidence" otherwise "abridges" a party's "right to a trial by jury." *Lightning Lube*, 4 F.3d at 1173 (quoting *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 183 (3d Cir. 1992)).

"Plaintiff did not make a Rule 50(a) motion for judgment as a matter of law during trial. He thus waived any right to relief under that rule." *Holt v. Pennsylvania*, Civ. A. No. 10-5510, 2018 WL 5617856, at *2 (E.D. Pa. Oct. 30, 2018); *see also Bender v. Norfolk S. Corp.*, 31 F. Supp. 3d 659, 665 n.2 (M.D. Pa. 2014) (finding that plaintiff "made no motion concerning Defendant's affirmative defenses [under Rule 50(a)] and, thus, waived any [Rule] 50(b) argument relating thereto"). Accordingly, Plaintiff's Rule 50(b) motion is denied.

Plaintiff also seeks relief under Federal Rule of Civil Procedure 59, which allows a court to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Possible grounds for new trials include, but are not limited to, improper evidentiary rulings, improper jury instructions, newly discovered evidence, or a determination that the jury's verdict is against the weight of the evidence. *See Ponzini v. Monroe Cnty.*, 789 F. App'x 313, 315 (3d Cir. 2019). "The decision to grant a new trial is within the sound discretion of the trial court, and such requests are disfavored." *Id.* (citing *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)).

Plaintiff asserts three bases for a new trial, which are all predicated on similar underlying arguments. First, Plaintiff argues that the jury failed to follow two of the Court's instructions: (1) its instruction regarding Plaintiff's burden to show proof of competitive harm in a relevant market, and (2) its instruction related to joining and participating in the conspiracy. With respect to the first instruction, Plaintiff argues the jury did not follow the Court's instruction that market share alone could establish competitive harm given the "clear and undisputed" evidence presented at trial on this point. (*See* Reply Mem. in Support of Pl.'s Rule 50(b) Mot. for a J. Notwithstanding the Verdict and Rule 59(a) Mot. for a New Trial (Dkt. 502) [Reply] at 3.) With respect to the second instruction, Plaintiff argues the jury did not follow the Court's instructions regarding joining a conspiracy because it did not find that any Defendants other than the EMMC joined the conspiracy despite "[t]he overwhelming weight of the evidence at trial." (*Id.* at 5.) Next, Plaintiff argues that the jury's verdict was internally inconsistent because the jury found the EMMC was a member of the conspiracy, but that no other Defendant joined the conspiracy. (*See id.* at 8-10.) Finally, Plaintiff asserts that the jury's findings with respect to proof of competitive harm in the market and participation in the conspiracy are against the weight of the evidence. (*See id.* at 10-11.)

Even assuming, for the purposes of this motion, that the jury erred by not finding that there were additional members of the conspiracy beyond the EMMC, Plaintiff's motion fails. Plaintiff argues that it satisfied its burden of proving harm to the market as a whole by showing an increase in price for fresh *agaricus* mushrooms and by showing the EMMC possessed sufficient market power. (Mot. at 11-14.) Plaintiff characterizes this evidence as not "contradict[ed]" (*id.* at 13) and "undisputed" (*id.* at 14). However, the testimony and evidence Plaintiff cites did not cut as clearly in its favor as it would have the Court believe. Defendants presented a plausible version of events and introduced evidence to undermine Plaintiff's narrative, which the jury found credible.

2. Defendants Brownstone Mushroom Farms, Inc.; C&C Carriage Mushroom Co.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Giorgi Mushroom Company; Kaolin Mushroom Farms, Inc.; Leone Pizzini & Son, Inc.; Louis M. Marson, Jr. Inc.; Modern Mushroom Farms, Inc.; Monterey Mushrooms, Inc.; Phillips Mushrooms, Inc; Oakshire Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; Eastern Mushroom Marketing Cooperative, Inc. (EMMC); To-Jo Fresh Mushrooms, Inc. and United Mushroom Farm Cooperative, Inc.'s Motion to Alter or Amend Judgment (Dkt. 498) is **GRANTED**.[2]

3. The Judgment in this case entered by the Court on March 23, 2022 (Dkt. 494) is hereby altered and amended pursuant to the Civil Judgment attached hereto.

BY THE COURT:

_____
Berle M. Schiller, J.

---

Defendants' expert also offered several criticisms of Plaintiff's expert's work and conclusions. As in any litigation that ultimately reaches trial, there were two sides of a story presented to an impartial jury. It is entirely possible that the jury simply rejected Plaintiff's arguments or its expert's testimony in reaching its reasonable conclusion that the conspiracy did not impact the market. Stated differently, faced with the parties' competing narratives and dueling experts' mathematical analyses and conclusions, the jury may well have believed Defendants' explanations and evidence rather than Plaintiff's. *See Brown v. City of Phila.*, Civ. A. No. 18-1126, 2020 WL 1888953, at *3-4 (E.D. Pa. Apr. 16, 2020); *see also Ramsey v. Buchanan Auto Park, Inc.*, Civ. A. No. 16-1879, 2022 WL 673737, at *4-5 (M.D. Pa. Mar. 7, 2022). Plaintiff's arguments do not rise beyond merely wishing that the jury believed its side rather than Defendants'.

Accordingly, the Court does not find that the jury failed to follow its instructions. Nor does the Court find that the jury's factual determinations are against the clear weight of the evidence such that a new trial must be ordered. *See Williamson*, 926 F.2d at 1353 ("[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience."). The motion is therefore denied.

[2]    Plaintiff did not file an opposition to Defendants' motion. The Court therefore grants Defendants' motion as unopposed pursuant to Local Rule of Civil Procedure 7.1(c).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.*, | : | **No. 15-6480** |
| **Defendants.** | : | |

### CIVIL JUDGMENT

**AND NOW**, this **13th** day of **June, 2022**, in accordance with the Court's interrogatories to the jury and the jury's unanimous answers to the Verdict Form (Dkt. 493):

**IT IS ORDERED** that the Court's prior Judgment (Dkt. 494) be modified as follows:

**IT IS ORDERED** that Judgment be and hereby is entered in favor of Defendants Brownstone Mushroom Farms, Inc.; C&C Carriage Mushroom Co.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Giorgi Mushroom Company; Kaolin Mushroom Farms, Inc.; Leone Pizzini and Son, Inc.; Louis M. Marson, Jr. Inc.; Modern Mushroom Farms, Inc.; Monterey Mushrooms, Inc.; Phillips Mushrooms, Inc.; Oakshire Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; Eastern Mushroom Marketing Cooperative, Inc. (EMMC); To-Jo Fresh Mushrooms, Inc. and United Mushroom Farm Cooperative, Inc. and against Plaintiff, Winn-Dixie Stores, Inc.

**BY THE COURT:**

**ATTEST:** _____

*Deputy Clerk*

A11

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.*, | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.*, | : | **No. 15-6480** |
| **Defendants.** | : | |

## ORDER

**AND NOW**, this **10th** day of **February, 2022**, upon consideration of the following motions and responses thereto, it is hereby **ORDERED** that:

1. Defendant United Mushroom Farms Cooperative, Inc.'s ("United") Motion in Limine to Exclude Alleged Co-Conspirator Statements (Dkt. 375) is **DENIED**.[1]

---

[1] Out-of-court statements offered for the truth of the matter asserted are generally inadmissible hearsay. *See* Fed. R. Evid. 801(c). However, they may be admissible as co-conspirator statements if the moving party proves "by a preponderance of evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Weaver*, 507 F.3d 178, 181 (3d Cir. 2007). At this stage of the proceedings, the Court's decision is limited to admissibility only and has no bearing on Winn-Dixie's ultimate burden to prove liability. *See In re Processed Egg Prods. Antitrust Litig.*, MDL No. 08-2002, 2019 WL 5656101, at *2 n.2 (E.D. Pa. Oct. 31, 2019) [hereinafter *In re Eggs*] (citing *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 229 (E.D. Pa. 2016)). Both Third Circuit precedent and the Federal Rules of Evidence favor admissibility. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 376 (3d Cir. 2004); *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d at 229.

Winn-Dixie's Sherman Act claims depend on the existence of a "contract, combination . . . or conspiracy" that restrains trade. 15 U.S.C. § 1. Accordingly, to admit co-conspirator statements against United, Winn-Dixie must show by a preponderance of the evidence that United joined together with at least one other entity to restrain trade. *See Weaver*, 507 F.3d at 181; *In re Eggs*, 2019 WL 5656101, at *5 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). But "the quantity of evidence used to prove a conspiracy" for purposes of admitting co-conspirator statements "need not be great." *In re Eggs*, 2019 WL 5656101, at *2.

A12

2. United's Motion in Limine to Limit Evidence and Argument Regarding United's Potential

Liability in an Alleged Antitrust Conspiracy (Dkt. 376) is **GRANTED in part and**

**DENIED in part**. Plaintiff Winn-Dixie Stores ("Winn-Dixie") and United will be

---

For the limited purposes of this motion, *see In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d at 229, the Court concludes that Winn-Dixie has carried its burden. United argues that even though it joined the EMMC in April 2003 and attended the group's meetings, mere membership and attendance at meetings is not enough to establish that it joined the conspiracy. (*See* Dkt. 375 at 8.) Further, it asserts that it was not a member of the conspiracy because its mushroom sales were made exclusively to other EMMC members and were therefore not subject to the EMMC's minimum pricing policy. (*See id.* at 4.) However, a conspiracy may be established if "the parties knowingly worked together to accomplish a common purpose," regardless of whether they all "acted exactly alike" or "possessed the same motive for entering the agreement." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks*, 386 F. App'x 214, 221 (3d Cir. 2010); *see also In re Eggs*, 2019 WL 5656101, at *15 (noting that co-conspirators "need not participate in every action taken in furtherance of the conspiracy").

Winn-Dixie's evidence shows that EMMC members committed themselves to selling mushrooms at fixed prices and that the EMMC instituted and amended pricing policies. (*See, e.g.*, Dkt. 402 Ex. 19 (EMMC Membership Agreement) ¶¶ 3, 5; Exs. 4-12, 21-29 (pricing policies)). Even if United only sold its products to other EMMC members, doing so increased the EMMC's overall mushroom supply, which United knew the EMMC could sell at its minimum prices. (*See id.* Ex. 36 (EMMC Membership Committee Report noting that increasing membership "increases the critical mass of the organization by increasing the pounds of mushrooms marketed under the EMMC's control").) United thereby furthered the conspiracy's ends. *See In re Magnesium Oxide Antitrust Litig.*, Civ. A. No. 10-5943, 2011 WL 5008090, at *17-18 (D.N.J. Oct. 20, 2011) (party that facilitated co-conspirators' conduct, was aware of price-fixing and market allocation agreements, and attended meetings to ensure enforcement of same joined conspiracy given its "informed and interested cooperation" in the scheme); *see also In re Eggs*, 2019 WL 5656101, at *15 (attendance at meetings was "evidence of [party's] awareness of" conspiracy's anticompetitive practices and involvement in conspiracy, even if it did not participate in every aspect of the conspiracy). Accordingly, for purposes of this motion, the Court finds that Winn-Dixie has shown by a preponderance of the evidence that United joined a conspiracy. *See Deborah Heart & Lung Ctr. v. Penn Presbyterian Med. Ctr.*, Civ A. No. 11-1290, 2011 WL 6935276, at *6 (D.N.J. Dec. 30, 2011) (rejecting argument that party lacked "a unity of purpose with the other" conspiracy members because they had different goals since parties need not have "identical motives" or even anti-competitive motives to join a conspiracy); *Acme Mkts., Inc. v. Wharton Hardware & Supply Corp.*, 890 F. Supp. 1230, 1239 (D.N.J. 1995) (concluding that parties with "independent motives" could "act[] in concert to restrain competition" in violation of § 1 of the Sherman Act).

For the sake of clarity, the Court notes that this ruling shall in no way limit United's opportunity to raise objections to specific statements Winn-Dixie attempts to offer against it on other grounds.

permitted to introduce evidence and arguments to establish whether and when United joined the alleged conspiracy as well as whether and when United withdrew from the alleged conspiracy. If Winn-Dixie establishes that United joined the alleged conspiracy and United establishes that it successfully withdrew from the conspiracy, United's liability shall be limited to damages caused by the conspiracy's conduct before its withdrawal date. It will be Winn-Dixie's burden to prove to the finder of fact what damages flow from acts of the alleged conspiracy taken prior to United's withdrawal.

3.  Defendant Eastern Mushroom Marketing Cooperative's ("EMMC") Motion in Limine No. 1 to Preclude Testimony and Other Evidence Regarding the EMMC's Supply Control Program at Trial as Irrelevant to Winn Dixie's Price Fixing Claims (Dkt. 377) is **DENIED**. Whether and why the EMMC implemented the Supply Control Plan is relevant to determining whether the EMMC engaged in other conduct with similar intent and is therefore relevant under the rule of reason analysis. However, defendants will be permitted to continue to argue that Winn-Dixie is unable to establish damages because its expert did not sufficiently account for the Supply Control Plan in his regression analysis.

4.  EMMC's Motion in Limine No. 2 Seeking Application of the Rule of Reason to Defendants' "Supply Control" Program (Dkt. 378) is **DENIED**.[2]

---

[2]    Judge O'Neill previously found that the Supply Control Program did not require cooperation from "vertically aligned distribution entities," unlike the implementation of the EMMC's minimum pricing policies. *In re Mushroom Direct Purchaser Antitrust Litig.*, Civ. A. No. 06-620, 2015 WL 6322383, at *16 (E.D. Pa. May 26, 2015). Consequently, he held the Supply Control Program was subject to per se liability because an agreement to restrict production is analyzed under the same framework as a price-fixing agreement since they are both designed to raise, stabilize, or otherwise fix prices. *See id.*

The EMMC argues that *In re Processed Egg Products Antitrust Litigation*, 962 F.3d 719 (3d Cir. 2020), warrants application of the rule of reason to the Supply Control Program rather

than the per se standard. *Eggs* involved an alleged conspiracy to restrict the supply of eggs through, among other means, a "Certification Program," which consisted of a set of animal welfare measures (including reducing the number of chickens in a cage and restrictions on replacing hens once they died). *Id.* at 723. The district court applied the rule of reason because the Certification Program was not an express agreement to restrain supply and plaintiffs failed to provide evidence that it was an effort to increase prices by limiting supply. *Id.* at 724. Additionally, the Certification Program had plausible pro-competitive benefits, including increasing hens' health, reducing disease, and promoting overall increased egg production. *Id.* The district court also noted that the supply of eggs in fact increased during the class period and the Certification Program did not "limit the number of hens a producer could own or the number of eggs a producer could produce." *Id.*

Plaintiffs appealed and argued the district court should have applied the per se rule. *Id.* at 726. The Third Circuit disagreed because the Certification Program "was not an express agreement to reduce the supply of eggs, much less to fix prices." *Id.* at 728. Nor was it clear that the Certification Program "would 'have manifestly anticompetitive effects and lack any redeeming virtue.'" *Id.* (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). Consistent with the district court's findings, the Third Circuit noted that the Certification Program could lead to an increase in output because various aspects of the Certification Program might have facilitated increased egg production. For example, even though the Certification Program required placing fewer hens in a given cage, hens with more cage space may actually produce more eggs and the Certification Program did not restrict how many cages a producer could operate. *Id.* at 728. Accordingly, the Third Circuit found that "the economic impact of the actions at issue cannot be predicted with a high degree of certainty," and it determined that the district court properly applied the rule of reason. *Id.* at 728-29.

Here, the EMMC adopted a significantly more straightforward plan that involved buying farms to reduce supply. The Certification Plan in *Eggs* affected the way eggs were produced and may have thereby promoted increased egg production. But the EMMC's plan did not affect how mushrooms were grown and instead reduced the number of farms that could potentially grow mushrooms. Unlike the *Eggs* plaintiffs, Winn-Dixie provided evidence suggesting that the Supply Control Plan was intended to reduce supply. (*See* Dkt. 379 at 6-7, 9.) Although the EMMC is correct that, like the Certification Program in *Eggs*, the Supply Control Plan did not contain an explicit output restriction, the Supreme Court has previously held that removal of supply from potential competitors' control as a means of stabilizing the market is subject to the per se rule. *See United States v. Socony Vacuum Oil Co.*, 310 U.S. 150, 216 (1940); *see also id.* at 224.

Contrary to the Certification Program in *Eggs*, there does not appear to be a valid business purpose for the Supply Control Program other than limiting competition. *See Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016) (noting the per se rule applies to a business practice that "on its face, has no purpose except stifling competition") (internal quotations omitted). Finally, even if the EMMC were correct that the effect of the Supply Control Program may have reduced prices and increased supply, (*see* Dkt. 378 at 12), the Supreme Court has noted that "[f]or the sake of business certainty and litigation efficiency," antitrust doctrine has "tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable." *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 344 (1982).

A15

5. EMMC's Motion in Limine No. 3 for Clarification of Rulings with Respect to References to the Capper-Volstead Act at Trial (Dkt. 379) is **DENIED**. The Court has determined that defendants are not entitled to immunity under the Capper-Volstead Act. *See Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, Civ. A. No. 15-6480, 2022 WL 226174, at *6 (E.D. Pa. Jan. 26, 2022). Accordingly, the parties shall redact any references to the Capper-Volstead Act from their proposed exhibits or designated testimony and shall confer regarding their proposed redactions. Should any disputes regarding specific references to the Capper-Volstead Act remain outstanding, the parties must inform the Court of their disputes by joint letter to be submitted by no later than **Tuesday, February 22, 2022**.

6. EMMC's Motion in Limine Regarding the Court's Order of February 14, 2020 in the Publix and Giant Eagle Cases, Precluding Evidence of Certain Pro-Competitive Attributes of the EMMC's Minimum Pricing Policy (Dkt. 380) is **DENIED**. As the Court noted in that Order, "the Sherman Act does not permit defendants to justify anticompetitive behavior by arguing that the behavior forestalls certain negative consequences where those consequences are the result of competition." Accordingly, the EMMC will not be permitted to argue that increased producer prices, increased producer profits, decreased producer losses, or helping firms stay in operation are valid pro-competitive benefits under the rule of reason.

7. Winn-Dixie's Motion in Limine to Preclude Defendants' Purported Procompetitive Benefits (Dkt. 381) is **GRANTED** for substantially the same reasons as set forth in the Court's decision regarding Dkt. 380.

8. Winn-Dixie's Motion in Limine for the Application of the Quick Look Rule of Reason

Page 5 of 8

A16

Analysis to the EMMC Minimum Prices and Pricing Policy (Dkt. 382) is **DENIED**.[3]

9.  Winn-Dixie's Motion in Limine to Preclude Evidence and Arguments of Limited

    Participation (Dkt. 383) is **DENIED**. Although co-conspirators are jointly and severally

    liable for damages, the evidence Winn-Dixie seeks to exclude is relevant for assessing

---

[3]      Judge O'Neill previously held that the rule of reason applied to the EMMC's minimum pricing policies because the alleged scheme included horizontal as well as vertical elements and because certain EMMC members were fully integrated and other members maintained relationships with upstream distributors. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 6322383, at *12-15. Such arrangements are properly considered under the rule of reason.

     The parties now dispute whether the traditional rule of reason framework should apply or whether the "quick look" mode of analysis is more appropriate. "Quick look" is an "abbreviated . . . analysis under the rule of reason" that can be applied when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999).

     Winn-Dixie relies heavily on the Sixth Circuit's decision in *In re Southeastern Milk* to support its argument that the quick look standard applies because the conduct here included vertical and horizontal elements. (*See* Dkt. 382 at 3-6.) Winn-Dixie states that because of this aspect of the agreement, the Sixth Circuit "applied the Quick Look analysis" and provided a "strong indication that it should apply" on remand. (*Id.* at 3.) Winn-Dixie is correct that the Sixth Circuit merely suggested that the arrangement may warrant application of the quick look standard and in fact specifically noted that "the district court may yet determine that a full rule of reason analysis is still required." *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 275-76 (6th Cir. 2014). And in fact, on remand, after considering the nature of the restraint, the relevant market, and the complexity of the agreement, the district court found that "quick-look analysis is inappropriate in this case." *Food Lion, LLC v. Dean Foods Co.*, Civ. A. No. 07-188, 2016 WL 1259959, at *4 (E.D. Tenn. Mar. 30, 2016).

     The Court finds that quick look analysis is not appropriate here because the effects of the minimum pricing policy are not "obviously or facially anticompetitive." *Id.* at *3. The EMMC has provided evidence that the supply of mushrooms may have increased and the price of mushrooms may have decreased as a result of the minimum pricing policy. (*See* Dkt. 393 at 3 (citing David Report at Figs. 1-2)); *see also In re Processed Egg Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1047 (E.D. Pa. 2016) (quoting *Cal. ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011)) (noting that the quick look approach is not appropriate where "empirical analysis is required to determine [the] challenged restraint's net competitive effect"). Further, the conspiracy involves a complex relationship among numerous parties with varying market roles. *See Food Lion*, 2016 WL 1259959, at *4. Accordingly, the Court finds that the traditional rule of reason analysis should apply.

A17

whether any defendant joined the conspiracy at all. While evidence of a defendant's level of involvement is relevant for this purpose, the Court may revisit the admissibility of such evidence or offer a limiting instruction to the extent any defendant seeks to introduce evidence or argue that they are liable for a smaller portion of damages because of their claimed limited participation.

10. Winn-Dixie's Motion in Limine to Preclude Evidence and Arguments of General Financial Condition (Dkt. 384) is **GRANTED in part and DENIED in part**. The Court agrees with the parties that evidence of the parties' sizes, profitability, and financial conditions is not admissible for the purpose of showing whether Winn-Dixie should or should not receive a judgment in its favor. (*See* Dkt. 384 at 4; Dkt. 389 at 1.) Such evidence is irrelevant and could be highly prejudicial. *See* Fed. R. Evid. 401-03. Accordingly, the Motion is granted with respect to that purpose. Subject to objections at trial, the Court will allow the parties to introduce arguments and evidence related to the parties' size, profitability, and financial conditions for other proper purposes.

11. Winn-Dixie's Motion in Limine to Preclude Defendants from Asserting a "Good Faith" or "Reliance on Counsel" Defense (Dkt. 385) is **GRANTED**. Winn-Dixie's claims do not require proof of specific intent. *See In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 391-93 (E.D. Pa. 2014). Even if defendants' intention in seeking counsel's advice regarding the formation of the EMMC or the advice itself is somehow relevant to defending against Winn-Dixie's claims under the rule of reason, the probative value of any such evidence is substantially outweighed by a danger of unfair prejudice or misleading the jury. *See* Fed. R. Evid. 403. Evidence of attorney involvement in the formation of the

A18

Case: 22-2289    Document: 19    Page: 85    Date Filed: 10/24/2022

Case 5:15-cv-06480-BMS    Document 417    Filed 02/10/22    Page 8 of 8

EMMC or defendants' intention in seeking counsel's advice could permit the jury to conclude that counsel's guidance, whether right or wrong, ensured that defendants' actions did not violate the antitrust laws and would be unfairly prejudicial and potentially misleading to the jury. Accordingly, the parties shall redact any references to defendants' reliance on counsel from their proposed exhibits or designated testimony and shall confer regarding their proposed redactions. Should any disputes regarding specific references to counsel remain outstanding, the parties must inform the Court of their disputes by joint letter to be submitted no later than **Tuesday, February 22, 2022**. If the parties intend to seek the admission of any documents or testimony that refer to counsel, they must propose language that the Court may use to explain any such references to the jury.

12. Winn-Dixie's Motion in Limine to Preclude References at Trial to the Capper-Volstead Act (Dkt. 386) is **GRANTED** for substantially the same reasons as set forth in the Court's decision regarding Dkt. 379.

**BY THE COURT:**

**Berle M. Schiller, J.**

Page 8 of 8

A19