UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

No. 22-2289

_____

WINN-DIXIE STORES, INC.; BI-LO HOLDINGS, LLC, Appellants

v.

EASTERN MUSHROOM MARKETING COOPERATIVE, INC.; ROBERT A. FERANTO, JR., t/a Bella Mushroom Farms; BROWNSTONE MUSHROOM FARMS, INC.; TO-JO FRESH MUSHROOMS, INC.; CARDILE MUSHROOMS, INC.; CARDILE BROS. MUSHROOMS PACKAGING; COUNTRY FRESH MUSHROOM CO.; FOREST MUSHROOM, INC.; FRANKLIN FARMS, INC.; GINO GASPARI & SONS, INC.; GASPARI BROS. INC.; GIORGI MUSHROOM COMPANY; GIORGIO FOODS, INC.; KAOLIN MUSHROOM FARMS, INC.; SOUTH MILL MUSHROOM SALES, INC.; LRP MUSHROOMS INC.; LRP-M MUSHROOMS LLC; LEONE PIZZINI AND SON, INC.; MODERN MUSHROOMS FARMS, INC.; SHER-ROCKEE MUSHROOM FARM; C & C CARRIAGE MUSHROOM CO.; OAKSHIRE MUSHROOM FARM, INC.; PHILLIPS MUSHROOM FARMS, INC.; HARVEST FRESH FARMS, INC.; LOUIS M. MARSON, JR., INC.; MARIO CUTONE MUSHROOM CO., INC.; M.D. BASCIANI & SONS, INC.; MONTEREY MUSHROOMS, INC.; MASHA & TOTO, INC., t/a M&T Mushrooms; W & P MUSHROOM, INC.; MUSHROOM ALLIANCE, INC.; CREEKSIDE MUSHROOMS LTD; J-M FARMS, INC.; UNITED MUSHROOM FARMS COOPERATIVE, INC.; JOHN PIA;  and MICHAEL PIA, Respondents.

**APPELLANTS' PETITION FOR REHEARING
AND REHEARING EN BANC**

Patrick J. Ahern
Mark Schirmer
Ahern and Associates, P.C.
8 South Michigan Avenue, Suite 3700
Chicago, Illinois 60603                    *Counsel for Appellants/Petitioners*

## RULE 35.1 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that consideration by the full court is necessary to secure and maintain uniformity of decisions regarding the use and application of the Quick Look analysis. The Panel's decision is contrary to this Court's discussion of the Quick Look Analysis in *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820 (3d Cir. 2010) and *United States v. Brown Univ.*, 5 F.3d 658, 673-74 (3d Cir. 1993) and its decision in *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), and Supreme Court discussion in *NCAA v. Board of Regents*, 468 U.S. 85 (1984), and its decisions in *National Society of Professional Engineers v. U.S.*, 435 U.S. 679 (1978), and *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986). In addition, the Panel's decision is inconsistent with *Acumed LLC v. Advanced Surgical Services*, 561 F.3d 199, 217-18 (3d Cir. 2009), and *Mosley v. Wilson*, 102 F.3d 85, 90-91 (3d Cir. 1996), addressing inconsistent verdicts. Further, this appeal involves two questions of exceptional importance: (1) whether a jury verdict finding a conspiracy but only one participant is inconsistent and requires a new trial, and (2)(a) whether a conspiracy with allegedly "vertical" elements must be judged under the Rule of Reason regardless of the nature of the agreements or restraints proven and/or (b) whether the

Rule of Reason applies, as opposed to the Quick Look Analysis,[1] even where a horizontal agreement among manufacturers to fix prices at the distributor level does not require a vertical agreement by the distributors to effectuate the horizontal agreement. *See, e.g. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211 (1951)(seriatim). Finally, failure to apply the Quick Look Analysis here would immunize a blatant price-fixing scheme.

## I.    INTRODUCTION

Winn-Dixie brings this petition on several grounds.  First, the Panel made significant errors that clearly formed the basis for its decision not to apply the Quick Look Analysis.[2] Those errors included that the EMMC agreement was to set prices that defendant competitor producers (not farmers)[3] charged their own captive distributors.[4] That is plainly incorrect based on the record evidence and was not

---

[1] "This is…an important issue because the quick-look analysis not only relieves the plaintiff of the burden of showing anticompetitive effects in the relevant market as part of their *prima facie* case, it also shifts the burden to defendants 'to show empirical evidence of procompetitive effects.'" *Realcomp II Ltd. v. FTC*, 635 F.3d 815, 825 (6th Cir. 2011).

[2] The Panel's errors misunderstood the anticompetitive scheme encompassed by the EMMC minimum pricing and policies.  These errors were stated as the Panel's understanding as to how the EMMC minimum pricing and policies worked. Thus, Winn-Dixie is not basing its petition for rehearing on banc on the Panel's erroneous application of the law to the facts; rather the Panel's numerous material misunderstandings of the EMMC minimum pricing and policies caused it to make an erroneous decision on whether the Quick Look Analysis should apply.

[3] The Panel's references "farmers" and "upstream farmers" is not entirely accurate because some EMMC producer members contracted out to farmers that only grew mushrooms. "Producer" is more accurate. That is what the EMMC members called themselves, particularly in the EMMC Membership Agreements.

[4] Op. at 5: "Given these multifaceted relationships, the alleged conspiracy here can be distilled as ***an agreement by EMMC members to set the prices they themselves charged to vertically oriented***

disputed.[5]  EMMC minimum prices were the prices charged by captive distributors to their customers, including retailers like Winn-Dixie.  The Panel also erred when it stated that defendant competitor producers "hoped to coerce" captive distributors to charge the minimum prices to their customers.[6] This is also plainly incorrect based on the record evidence. The EMMC minimum pricing and policies plainly provided that defendant competitor producers agreed to have their captive distributors charge the minimum prices.  Moreover, some producers like Monterey were vertically integrated so no captive distributor was involved. Finally, the producers did require their captive distributors to charge the minimum prices.

In addition, the Panel erred in its holding that the distributors were not required to charge the minimum prices.  That is plainly incorrect based on the record evidence.  As stated above, the EMMC producer members' agreement was to set the prices their captive distributors charged to their customers. Because they were controlled by EMMC producer members, the captive distributors had no choice but to charge their customers the minimum prices. Finally, the above errors were the key central premises to the Panel's ruling that the Quick Look analysis should not apply.

*distributors*—some of which were integrated with EMMC members and some of which were not—in an effort to boost the prices those distributors charged to retailers." (Emphasis added.)

[5] None of the Defendant/Appellees, including the EMMC Defendants, disputed these facts nor made any arguments that ended up in the Panel's erroneous factual holdings.

[6] Op. at 4-5: "Those minimums, critically, were 'not the price at which [growers] sold the product,' App. 112, but ***instead the price at which EMMC members hoped to coerce downstream distributors to go to market.***") (Emphasis added.)

As will be seen below, the Panel erred when it decided not to apply the Quick Look Analysis. First, free of the Panel's errors, there is nothing complex about the straightforward horizontal price-fixing in which the EMMC members engaged. Indeed,this is what the jury found when it answered "Yes" to Question 1 on the verdict form. See discussion, *infra*, at 12.

Nor is such price-fixing of the type with which the Courts do not have sufficient familiarity. Finally, any potential "vertical elements" of EMMC minimum pricing and policies were nullified by EMMC producer members' agreement to fix the price charged by their captive or controlled distributors to their customers. Finally, no vertical agreement by those distributors was necessary to effectuate the horizontal price-fixing scheme.

Thus, based on its errors, the Panel erred in its holding that EMMC minimum pricing and policies did not fit into the holdings of *Insurance Brokerage* and more importantly, the Supreme Court decisions in *Professional Engineers* and *Indiana Dentists*. Finally, the Panel's treatment of this case as a vertical price-fixing agreement between independent actors at two levels of distribution was erroneous. Rather, this case presented a horizontal agreement to fix prices at the level of the captive or controlled distributors, with no additional vertical agreement necessary, as described above.

## II.    THE PANEL MADE SIGNIFICANT ERRORS MATERIAL TO ITS DECISION NOT TO APPLY THE QUICK LOOK ANALYSIS.

The panel made several errors material to its decision not to apply the Quick Look Analysis.  Those errors included that the EMMC agreement was to set prices that defendant competitor producers charged their own captive distributors. That is plainly incorrect based on the record evidence and was not disputed. The EMMC minimum prices were prices charged by the captive distributors to their customers. Steve Phillips of Phillips Mushrooms ("PM") testified that Phillips L.P. ("PLP") was the packer/shipper that sold the mushrooms that PM grew, and both entities were owned and controlled by the same people.  More importantly, in terms of the agreement that PM made to follow the EMMC minimum prices, those prices were the prices charged by PLP, the packer/shipper, not PM:

> Q. Now, Phillips Mushroom is a grower, is that right?
> A. Yes.
> Q. And does it have a related packer or shipper?
> A. We packed our own product.
> Q. What … is Phillips, L.P.?
> A. That's our packing operation.
> Q. Okay, also sales, as well?
> A. Yes.
> Q. Okay. And is it commonly owned and controlled by the same people that own Phillips Mushrooms?
> A. Yes.
> Q. Okay. ***And in terms of the agreement that Phillips made to follow the EMMC minimum prices, those would be prices charged by Phillips, L.P.?***
> A. Correct.  (A732-33)). (Emphasis added.)

Finally, Phillips testified that PM did its best to charge the EMMC minimum prices

and in fact followed them most of the time.[7]

Based on this testimony, PM as the EMMC producer member caused PLP, which was under common ownership and control, to charge the EMMC minimum prices most of the time. Therefore, the Panel's holding that the EMMC minimum prices were the prices charged by members to their distributors is incorrect. Moreover, because PM's distributor PLP was under common ownership and control, there was no question that PLP would charge the EMMC minimum prices to its customers, and no coercion or vertical agreement was needed nor was there any uncertainty that that would happen. Because its error was contrary to the evidence, the Panel's decision needs to be vacated and the Quick Look Analysis applied to this case.

In addition, the Panel erred stating that defendant competitor producers "hoped to coerce" their captive distributors to charge the minimum prices to their customers and that the distributors were not required to charge the minimum prices. This is also plainly incorrect based on the record evidence. Instead, as shown above and below, defendant competitor producers agreed to have their captive distributors charge the minimum prices.

---

[7] "Q. Okay. And when Phillips joined the EMMC, it agreed to abide by the EMMC minimum prices and policies, correct? A. That was my intent, yes. Q. And you did your best to follow the EMMC rules, correct? A. Yes. Q. In fact, Phillips followed the EMMC minimum prices most of the time, correct? A. Most of the time." (A729)

EMMC producer members agreed to follow the EMMC Current Policies ("Policies"), which "were intended to be an up-to-date summary of everything that [they] have agreed to as members." A450, Ex. 438. The Policies provided that "the pricing listed for each product is the minimum price for that product delivered to a customer in the region." A450-51, Ex. 438. Finally, "delivered product" in the Policies meant "delivered product to the retailer." A451.

Moreover, the producers did require their captive distributors to charge the minimum prices. Chuck Ciarrcocchi of Modern Mushroom, one of the largest mushroom producers, testified that Modern agreed that it would follow the Policies (A676), C&C Carriage, a related company, packaged, shipped and sold the mushrooms produced by Modern (A674-75), "***Modern had to make sure that C&C charged the EMMC minimum prices***" (A678)(emphasis added), "C&C raised prices in order to put the minimum prices into effect" (A678), and "C&C raised prices to numerous customers to reflect the minimum prices" (A679).

The EMMC producer members' agreement to set the minimum prices charged by their captive distributors to their customers, including retailers, required the members to cause their captive distributors to charge those minimum prices. Mike Cardile testified that the EMMC Membership Agreement that Cardile Mushrooms signed "***required that Cardile Mushrooms, the EMMC member, cause Cardile Brothers to charge the EMMC minimum prices.***" (A655)(Emphasis added) Cardile

was shown Paragraph 3 of the Membership Agreement (Ex. 48), "Cooperative Marketing," which provides that a signatory to the Agreement "agrees to handle and market all crops of mushrooms **under producer's control** during the term of this agreement pursuant to the terms and conditions of this agreement and the Articles of Incorporation and Bylaws of the Cooperative." Ex. 48, A655 (emphasis added).[8]

Some of the producers like Monterey were vertically integrated so no captive distributor was involved. (A438) Shah Kazemi of Monterrey Mushrooms, the largest mushroom grower, testified that the EMMC minimum prices were for sales to retailers (A437),[9] Monterrey agreed to charge the minimum prices to its retail customers (A438) and followed them "for the most part" (A440), and most importantly, the agreement among the EMMC producer members was "to have the minimum price charged to retailers." (A439)

Finally, EMMC producer members controlled their captive distributors. Tony D'Amico testified that Brownstone Mushroom Farms, a producer, and Tojo Mushrooms, its related packer/shipper/seller, were all controlled by his family and that the EMMC minimum prices applied to sales to retailers – sales "outside of [the]

---

[8] Cardile also testified: "Q. Did Cardile Mushroom follow the EMMC prices most of the time? A. Yes, sir. Q. And what is Cardile Brothers? A. Cardile Brothers was a -- basically like a sister company of Cardile Mushroom. It was a packing, transportation, and sales company. Q. Was Cardile Brothers the one that charged the EMMC minimum prices? A. Correct." (A654)

[9] Gino Gaspari also testified that "the EMMC minimum prices applied to sales to retailers" and Gino Gaspari & Sons tried to abide by the EMMC minimum prices. (A1104) Finally, he testified: "Q. The price to retailers was supposed to be controlled by the EMMC, correct? A. We set minimum pricing." (A1105)

family" and not sales between Brownstone and Tojo.[10] Thus, because they were commonly owned and controlled by EMMC producer members, the captive distributors had no choice but to charge their customers the minimum prices. D'Amico's testimony shows that EMMC producer members had producer and packer/shipper/seller entities that were related and commonly controlled and EMMC minimum prices were not the price charged by the producer to the related packer/shipper/seller, as the Panel erroneously found.

## III. BASED ON ITS ERRORS, THE PANEL ERRED IN DECIDING NOT THE APPLY THE QUICK LOOK ANALYSIS.

The Panel's errors were material – were the central premises – to its holding that the Quick Look Analysis should not apply. First, the Panel held that Winn-Dixie alleged a singular effort among upstream farmers and downstream distributors and "the success of that singular effort depended on coordination by multiple actors at multiple levels." Op. at 12. There are several errors here. As seen below, the jury found – not Winn-Dixie alleged – a single overarching conspiracy to raise the price of mushrooms using the EMMC minimum prices and policies. See discussion, infra, at 12. In addition, no coordination or vertical agreement was needed between the

---

[10] "Q. Okay. And the EMMC minimum prices applied to sales by Tojo, correct? A. It applied to sales by our family. … there's many different parts of our family business. Q. But it applied to sales to retailers? A. It applied to sales of whoever we were selling to. Q. … it did not apply to sales between the grower and the packer/shipper, correct? A. There were no sales between family entities. … it's not like we sold the mushrooms at a certain price … within our family. Q. … But the price that you sold them outside of your family was supposed to be at the EMMC minimum price, correct? A. It was supposed to be. (A993-94)

producers and their captive distributors to charge the minimum prices. EMMC producer members were required by their Agreements and the Policies to charge the minimum prices on all mushrooms "under the producer's control," understood that the Agreement and Policies required them to cause their captive distributors to charge the minimum prices to retailers, and did cause their captive distributors to do so. Thus, the Panel's central premise not to apply the Quick Look Analysis is erroneous and its holding must be vacated.

Similarly, the Panel erred stating "the scheme's dependence on downstream, non-EMMC members precludes our drawing the anticompetitive inferences typically associated with purely horizontal price-fixing restraints." Op. at 12. As seen above, no "dependence" was required. Thus, this central premise is also erroneous and requires the Panel's decision be vacated. Finally, the Panel's statement that it should have drawn the anticompetitive inferences typically associated with horizontal price-fixing restraints with respect to the EMMC minimum pricing and policies, but for such "dependence," suggests that with the correct facts, it would have applied the Quick Look Analysis.

The Panel also erred in distinguishing *Insurance Brokerage* from the EMMC minimum pricing and policies because Judge O'Neil held that there was "a remarkable lack of 'unity of interest' with both competing distributors and upstream EMMC growers." Op. at 13. First, his holding was on summary judgment and not at

the trial of this case. Second, his initial holding was made in the context of whether *Copperweld*, not *Insurance Brokerage*, should apply. Indeed, Kaolin and South Mill (Defendants here) argued that there were a single economic entity, which required was a complete unity of interest. 621 F. Supp. 2d 247, 287-88. More importantly, he held that "these distributors sold at EMMC prices." *Id.* at 287. Finally, to the extent that he was unable to untangle the horizontal and vertical elements of EMMC minimum pricing and policies (2015 U.S. Dist. LEXIS 143331 *69), he erred for the same reasons that the Panel erred. Finally, he proactively mentioned Quick Look Analysis, which neither raised. *Id.* *49, fn. 19. Thus, the Panel's reliance on Judge O'Neil's prior ruling to distinguish *Insurance Brokerage* is erroneous.

The Panel's holding that *Insurance Brokerage* is distinguishable because "there is no set of horizontal spokes and nothing akin to a unilateral vertical conduit" Op. at 13) is also erroneous. First, EMMC minimum pricing and policies was the center of the horizontal agreement – the "hub" sending out horizontal spokes, much like Marsh did in *Insurance Brokerage*. Second, the "vertical conduit" is provided by EMMC producer members' agreement to cause their captive distributors to charge the minimum prices to retailers. Thus, the Panel's holding that *Insurance Brokerage* is inapplicable and that EMMC minimum pricing and policies is not the type of anticompetitive scheme with which the Court has "amassed considerable experience" should be vacated.

Finally, the Panel's holding that the EMMC minimum pricing and policies were more akin to *Leegin* and *Toledo* because of the "tailored set of interrelated vertical and horizontal agreements among growers and distributors" is erroneous because, as seen above, the EMMC minimum pricing and policies did not need or rely on any vertical agreement by the captive distributors – they were "captive" -- under common ownership and control of the EMMC producer members.[11]

Stripped of the Panel's errors, there is nothing complex about the garden-variety horizontal price-fixing that the EMMC members engaged in, which the jury found when answering "Yes" to Question 1 on the Verdict Form:

> Do you find by a preponderance of the evidence, that there was a single overarching conspiracy to raise the prices of agaricus mushrooms by: (1) circulating minimum or target price lists ***along with rules and regulations requiring EMMC members to charge those prices*** …?

A7 (emphasis added). The jury found a conspiracy to raise mushroom prices by circulating minimum or target price lists along with the rules and regulations requiring EMMC members to charge those prices. By referencing the rules and regulations requiring EMMC members to charge minimum prices, the jury found that EMMC members were required to charge the minimum prices, which were prices to retailers. The Panel is not allowed to substitute its erroneous view of the EMMC minimum pricing and policies for the jury's finding and no

---

[11] Of course, this holding does not apply to the vertically integrated EMMC producer members like Monterrey.

Defendant/Appellee appealed that finding by the jury.

When viewed in the absence of the Panel's errors and instead the jury's finding on Question No. 1, this case falls squarely within the Quick Look Analysis applied in *Indiana Dentists* and *Professional Engineers* and discussed in *NCAA,* and in this Court's decision in *Insurance Brokerage,* and as discussed in *Deutcsher* and *Brown*.  The Quick Look Analysis "applies in cases where *per se* condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." *Brown*, 5 F.3d at 669; *Indiana Dentists*, 476 U.S. at 459; *NCAA*, 468 U.S. at 109; *Professional Engineers*, 435 U.S. at 692. In such cases, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999); *Deutscher,* 610 F.3d at 830-31.  "…[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis is required to demonstrate the anticompetitive character of such an arrangement.'" *NCAA*, 468 U.S. at 113; *Professional Engineers v. U.S.,* 435 U.S. at 692 (same). "Some restraints of trade are 'highly suspicious' yet 'sufficiently idiosyncratic that judicial experience with them is limited…Per se condemnation is inappropriate, but at the same time, the 'inherently suspect' nature of the restraint obviates the sort of 'elaborate industry analysis' required by the traditional rule-of-reason standard."

*Insurance Brokerage,* 618 F.3d at 317.

Here, the agreement was formed not at the distributor level, but at the manufacturer level – the level of EMMC producer defendants, who were undoubtedly competitors.  Moreover, the EMMC producer members' agreement to fix the prices their captive distributors charged their customers, including retailers, did not require any vertical agreement by or from the distributors in order to effectuate the agreement.  As such, the agreement here was no more than horizontal price-fixing, just like the horizontal agreements condemned under *Professional Engineers* and *Indiana Dentists*.  In addition, for reasons stated above, this horizontal agreement falls within the rubric of *Insurance Brokerage*.  Under all of those decisions, the EMMC minimum prices and policies warrant the application of the Quick Look Analysis.

If this Court needs support for the proposition that an analogous horizontal agreement to fix prices at the distributor level is subject to the Quick Look Analysis, *Kiefer-Stewart, supra,* held that an agreement between Seagram's and Calvert not to sell to distributors unless they adhered to the price restraints set by Seagram's and Calvert was illegal under the Per Se Rule without any vertical agreement by the distributors,[12] which provides a sufficient basis for the Quick Look Analysis to apply

---

[12] The holding in *Kiefer-Stewart*, like here, did not rely on a vertical agreement by the distributors and, as such was not affected by *Leegin*, which did not even mention *Kiefer-Stewart*.

to the horizontal agreement here.

Finally, the Panel's holding that the jury's finding of no competitive harm justifies the failure to apply the Quick Look Analysis has been rejected by *Brown,* which rejected the argument that the decision whether to apply the Quick Look Analysis should consider evidence of increased output or decreasing prices:

> MIT's … counterargument is that an abbreviated rule of reason analysis is appropriate only … when evidence establishes that "the challenged practice, unlike Overlap, manifestly has an adverse effect on price, output, or quality." … however, ***if an abbreviated rule of reason analysis always required a clear evidentiary showing of a detrimental effect on price, output, or quality, it would no longer be abbreviated.*** This is because proof of actual adverse effects generally will require the elaborate, threshold industry analysis that an abbreviated inquiry is designed to obviate.
>
> MIT's position also is contradicted by Supreme Court precedent. Without any mention of actual effects on price, output, or quality, … *Professional Engineers* required the association of engineers to affirmatively defend an ethics rule prohibiting members from discussing fees with prospective customers prior to being selected for a project. 435 U.S. at 692-96. The Court reasoned that the "anticompetitive character" of the agreement could be presumed because the ban on competitive bidding, like price fixing, "impeded the ordinary give and take of the market place." *Id.* at 692. … *Indiana Dentists* held that collectively withholding x-rays from patients' insurers was "likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or . . . the purchase of higher priced services, than would occur in its absence." 476 U.S. at 461-62.

*Id.* at 673-34 (emphasis added)(certain citations omitted). Based on *Brown*, *Professional Engineers* and *Indiana Dentists*, the Panel's holding is contrary to the proper inquiry: whether EMMC minimum prices and AMC target prices are

anticompetitive on their face and puts the proverbial cart before the horse.[13] Finally, if the Quick Look Analysis was applied below, Winn-Dixie would have prevailed because Defendant/Appellees presented no evidence of legitimate procompetitive justifications (Appeal Brief, pp. 35-37), which they did not dispute before this Court.

## IV.    THE PANEL ERRED ON OTHER GROUNDS

Given the page limitations, Winn-Dixie is constrained to address the entirety of the Panel's decision and hopes to do so on rehearing.  However, a few additional grounds for rehearing are noteworthy.  First, with respect to the inconsistency of the Verdict involving Questions 1 and 2, the Panel only cited to a portion of the Trade Association Instruction.  The rest of the Instruction indicated that the jury's answers to Questions 1 and 2 cannot be reconciled. Initial Brief at 24.

Second, with respect to competitive harm and market power, the Panel (1) chose the chart of Defendants' expert over the testimony of Jack Crooks, the EMMC and AMC Executive Director, that their collective market never dropped below 55% (A785), and (2) ignored Supreme Court decisions holding that market share over 67% is sufficient to confer market power. *American Tobacco v. U.S.,* 328 U.S. 781, 797 (1946) "over two-thirds of the entire domestic field of cigarettes … constituted "a substantial monopoly"). Finally, insofar as a rehearing on the Quick Look

---

[13] The decisions the Panel relied on are distinguishable – none involved price fixing. *In re Processed Eggs Products Antitrust Litigation*, 206 F. Supp. 3d 1043 (E.D.Pa. 2016)(cage space and backfilling restrictions for hens); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n. 10 (2d Cir. 2008)(sports league and no horizontal price fixing).

Analysis may obviate the need to address other aspects of the Panel's decision on competitive harm, and given the space restraints, Winn-Dixie incorporates by reference its arguments in its initial brief at 28-35 and its reply brief at 16-19.

## CONCLUSION

For the foregoing reasons, the Court should grant rehearing or rehearing en banc.

Dated: November 13, 2023

Respectfully submitted,

*/s/   Patrick J. Ahern*
Patrick J. Ahern
Mark Schirmer
Ahern and Associates, P.C.
8 South Michigan Avenue, Suite 3700
Chicago, Illinois 60603
(312) 404-3760
patrick.ahern@ahernandassociatespc.com

*Counsel for Appellants/Petitioners.*

## CERTIFICATION OF ADMISSION TO BAR

I, Patrick J. Ahern, certify as follows:

    1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

    2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: November 13, 2023

By: /s/ Patrick J. Ahern

Patrick J. Ahern

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief contains 3897 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using 2008 version of Microsoft Word in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: November 13, 2023

By: /s/ Patrick J. Ahern

Patrick J. Ahern

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 13th day of November 2023, the foregoing Petition for Rehearing and Rehearing En Banc filed through CM/ECF system and served on all parties or their counsel of record through the CM/ECF system.

Dated: November 13, 2023

By: /s/ Patrick J. Ahern

Patrick J. Ahern